## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| KERRY S. SYDNES, | : | |
| Individually and on behalf of all | : | |
| others similarly situated, | : | Case No. |
| | : | |
| Plaintiffs, | : | CLASS ACTION |
| | : | COMPLAINT |
| v. | : | |
| | : | JURY TRIAL |
| NATIONAL ARBITRATION FORUM, INC.; | : | DEMANDED |
| NATIONAL ARBITRATION FORUM, LLC; | : | |
| DISPUTE MANAGEMENT SERVICES, | : | |
| LLC d/b/a FORTHRIGHT; | : | |
| ACCRETIVE, LLC; | : | |
| AGORA; | : | |
| AXIANT, LLC; | : | |
| AMERICAN EXPRESS; | : | |
| BANK OF AMERICA; | : | |
| MBNA CORPORATION; | : | |
| WELLS FARGO; | : | |
| WACHOVIA; | : | |
| CAPITAL ONE FINANCIAL | : | |
| CORPORATION; | : | |
| CAPITAL ONE BANK (USA), N.A.; | : | |
| CAPITAL ONE, N.A; | : | |
| J.P. MORGAN CHASE; | : | |
| CITIGROUP, INC.; and | : | |
| DISCOVER CARD; | : | |
| | : | |
| Defendants. | : | |

## CLASS ACTION COMPLAINT

### INTRODUCTION

1.     The National Arbitration Forum ("Forum") is headquartered in

Minnesota, and is the largest arbitration company in the United States for

consumer credit disputes.  One of the Forum's officers, Edward Anderson, told hedge fund managers who eventually acquired an interest in the Forum that, "The FORUM is one of a kind; there is no competitor nor is there likely to be one . . . The barriers to entry border on being insurmountable[.]"

2.      The Forum has held itself out to the public, courts, and consumers as an independent, impartial entity.

3.      In fact, however, the Forum has worked behind the scenes with creditors and debt collection law firms, against the interests of ordinary consumers, in violation of federal and state consumer protection laws.

4.      On July 14, 2009, the Minnesota Attorney General sued the Forum in Hennepin County District Court, Minnesota, alleging violations of Minnesota's consumer fraud, false advertising, and deceptive trade practices laws.

5.      In less than a week, the Forum settled with the Minnesota AG, agreeing to stop arbitrating, taking part in processing, or administering any new consumer arbitrations anywhere in the United States, including any arbitration involving consumer debt, such as credit cards, consumer loans, utilities, telecommunications, health care and consumer leases.  (The Forum can still arbitrate internet domain name disputes, personal injury claims, and other cases.)

6.      This immediate capitulation by the Forum speaks volumes, no matter what the Forum says were its reasons for this decision.  The Forum's

arbitration business was extremely lucrative, bringing in millions of dollars a year.  The Forum would never have agreed to cease that business if it thought it had a reasonable chance of its business being found lawful.

## PLAINTIFF

7.     Kerry Sydnes is a resident of Lakefield, Minnesota, who arbitrated and lost a consumer debt dispute with the Forum.

## DEFENDANTS

8.     National Arbitration Forum, Inc. ("NAF, Inc.") is a privately held, for-profit Minnesota corporation, with a registered address and principal place of operations at 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426.  NAF, Inc. is the holder of the assumed name "National Arbitration Forum" and also does business under the names "National Arbitration Forum" and "Forum."

9.     National Arbitration Forum, LLC ("NAF, LLC") is a privately held, for-profit Delaware limited liability company with a registered address and principal place of operations at 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426.  NAF, LLC's registered agent is Michael Kelly. NAF, LLC also does business under the name "National Arbitration Forum."

10.    Dispute Management Services, LLC, d/b/a Forthright ("Forthright") is a privately held, for-profit Delaware limited liability company with a registered address and principal place of operations at 6465

Wayzata Boulevard, St. Louis Park, Minnesota 55426.  Forthright's registered agent is Michael Kelly.

11.    Collectively, Defendants NAF, Inc., NAF, LLC, and Forthright are referred to herein as the "Forum," the "Forum Defendants" or "NAF." The Forum Defendants share common office space, common directors, and each profits from the Forum's arbitration services.

12.    Defendant Accretive, LLC, is a private equity firm headquartered in New York, New York, which formed and funded Defendants Agora and Axiant, LLC.

13.    Defendant Agora is a family of private equity funds based in New York, New York that was created through Defendant Accretive in 2007 to acquire substantial financial interests in the Forum.

14.    Defendant Axiant, LLC is a debt collection agency headquartered in Huntersville, North Carolina, which was formed and funded by Defendant Accretive, LLC and which acquired the national debt collection law firm Mann Bracken, LLP.

15.    Defendant American Express is headquartered at World Financial Center, 200 Vesey Street, New York, New York 10285 and identifies the Forum as an arbitrator in its consumer agreements.

16.    Defendant Bank of America is headquartered at 100 N. Tryon Street, Bank of America Corporate Center, Charlotte, North Carolina 28255 and identifies the Forum as an arbitrator in its consumer agreements.  Bank

of America acquired Defendant MBNA Corporation, which also identifies the Forum as an arbitrator in its consumer agreements, in a merger that closed on January 1, 2006.

17.    Defendant Wells Fargo is headquartered at 420 Montgomery Street, San Francisco, California 94163 and identifies the Forum as an arbitrator in its consumer agreements.  Wells Fargo acquired Defendant Wachovia, which also identifies the Forum as an arbitrator in its consumer agreements, in a merger that closed on January 1, 2009.

18.    Defendant Capital One Financial Corporation is incorporated under Delaware law and, in 2004, became a bank holding company organized under the laws of the United States, with its principal place of business in McLean, Virginia.  Capital One Financial Corporation offers consumer lending and general purpose card products through its two principal subsidiaries, Defendants Capital One Bank (USA), N.A. and Capital One, N.A.  The Capital One Defendants identify the Forum as an arbitrator in their consumer agreements.

19.    Defendant J.P. Morgan Chase is a financial holding company organized under Delaware law with its principal place of business at 270 Park Avenue, New York, New York, and it identifies the Forum as an arbitrator in its consumer agreements.  J.P. Morgan Chase was formed by the merger, on July 1, 2004, of J.P. Morgan Chase & Co. and Bank One

Corporation.  The merger was touted as creating the second largest banking franchise in the United States.

20.     Defendant Citigroup, Inc. is a holding company incorporated under Delaware law with its principal place of business in New York, New York, and it identifies the Forum as an arbitrator in its consumer agreements.  Citigroup was formed as a result of an October 8, 1998 merger of Citibank, N.A. with and into a wholly owned subsidiary of Travelers Group, Inc.  After the merger, Travelers Group changed its name to Citigroup, Inc.

21.     Defendant Discover Card is headquartered at 2500 Lake Cook Road, Riverwoods, Illinois 60015 and identifies the Forum as an arbitrator in its consumer agreements.

22.     Collectively, the creditors identified in paragraphs 15 through 21, above, are referred to herein as the "creditor Defendants."

### JURISDICTION AND VENUE

23.     The Court has jurisdiction over this matter and Defendant under 15 U.S.C. § 4, 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337.

24.     Venue is proper in this judicial district under 15 U.S.C. § 22, 18 U.S.C. § 1965(a), and 28 U.S.C. § 1391(b) and (c) because Defendants transact business, committed an illegal or tortuous act, have an agent or are found in this district, or because a substantial part of the events described below were carried out in this district.

25.     Together with co-conspirators the Creditor Defendants, through their participation in numerous meetings and other communications, and as an exercise of their immense market power, combined, conspired and agreed to implement and/or maintain mandatory arbitration clauses as a term and condition of sale.  The primary purpose of these arbitration clauses is to eliminate access to judicial fora and collective remedial action, including class actions, by cardholders.  The creditor Defendants' agreement to impose or maintain collusive arbitration clauses in their respective adhesion contracts with their cardholders (which they refer to as "cardholder agreements") constitutes a *per se* violation of the antitrust laws, is an anti-competitive restraint on trade and serves no pro-competitive purpose.  As such, the arbitration clauses in the Creditor Defendants' cardholder "agreements" should be declared unlawful and the clauses voided.

## OPERATIVE FACTS

26.     In the fine print of consumer debt agreements (such as for credit cards, consumer loans, utilities, telecommunications, health care and consumer leases), the creditor Defendants insert pre-dispute arbitration clauses requiring consumers, like Plaintiffs, to forfeit their rights to have disputes resolved in court, and to have them instead resolved through a private system of binding arbitration.

27.     The agreements, which are sent to consumers by U.S. mail, typically mandate the use of a particular arbitration firm (or firms), and that firm is frequently the Forum.

28.     The Forum is the largest provider of consumer debt arbitrations in the United States, and claims that it has been appointed as the arbitrator in "hundreds of millions of contracts."

29.     When a consumer owes a debt that the creditor determines cannot be collected by other means, the creditor either initiates an arbitration action or sells the debt to a third party, who initiates an arbitration action.  Either way, these companies are usually represented by outside debt collection law firms.

30.     When a dispute goes to arbitration before the Forum, the Forum controls the arbitration process:  it drafts the Code of Procedure according to which arbitrations are conducted, schedules hearings, selects the arbitrator (unless the parties otherwise agree), and is responsible for the dismissal of claims or responses.

31.     The Forum represents itself to the public as a neutral and fair arbitrator.  By way example, the Forum provides on its website that:

> a.      it "ensures that parties receive a fair hearing from an impartial arbitrator at a reasonable cost . . . [and] the same fundamental rights they would receive in court."

    b.    it "is committed to the integrity of the legal process, and our arbitrations subscribe to all legal and ethical standards."

    c.    its policies "ensure both an impartial review of the facts as well as a decision based on applicable rules and laws."

    d.    it is not "affiliated with credit card companies or other businesses that use pre-dispute arbitration agreements."

    e.    it "is an independent administrator of alternative dispute resolution services."

    f.    "[c]ases are heard and decided by unbiased legal experts."

    g.    "[o]ur dispute resolution processes are designed to provide both parties with an equal opportunity to prevail."

    h.    the Forum is "not beholden to any company or individual that utilizes our services."

32.    Despite these (and other similar) representations to the public, however, the Forum is not a neutral and fair arbitrator.  It is in reality closely tied to creditors and debt collection law firms, and as a result, consumers whose cases are arbitrated through the Forum are hugely disadvantaged.

33.    The Forum obtains business by encouraging creditors, such as the creditor Defendants, to place mandatory pre-dispute arbitration clauses in their customer agreements and appoint the Forum as the arbitrator of any disputes that may arise in the future, and by urging creditors to pursue

arbitration claims to collect debts, whether directly or through referrals to debt collection law firms, which then file arbitration claims against consumers with the Forum.

34.    The Forum then assists these creditors by helping them to draft arbitration clauses, advising them on arbitration legal trends, and even helping them draft claims to be filed against consumers.

35.    Statements by the Forum reveal that the Forum is not an unbiased arbitrator, but is aligned with the creditors that provide it with a steady stream of income:

a.    "The customer does not know what to expect from Arbitration and is more willing to pay."

b.    Consumers "ask you to explain what arbitration is then basically hand you the money."

c.    "You [the creditor] have all the leverage [in arbitration] and the customer really has no choice but to take care of the account."

36.    The Forum is financially affiliated with a New York hedge fund group, Accretive, LLC, which owns one of the country's major debt collection enterprises.

37.    From 2006 to 2007, Accretive engineered two transactions through which it simultaneously took control of the country's largest debt collectors and became affiliated with the Forum.

38.     In the first of these transactions, Accretive formed, in 2007, several private equity funds under the name "Agora" (meaning "Forum" in Greek), which invested $42 million in the Forum and obtained governance rights in it.  Both Accretive (Agora) and the Forum (Forthright and NAF, LLC) created new companies in an effort to conceal their connection.

39.     In the second transaction, three of the country's largest debt collection law firms (Mann Bracken of Georgia, Wolpoff & Abramson of the District of Columbia, and Eskanos & Adler of California) merged into one large national law firm called Mann Bracken, LLP, which Accretive then acquired through a debt collection agency that it formed and funded, Axiant, LLC.

40.     In 2006, the Forum processed 214,000 consumer debt collection arbitration claims, of which 125,000 (nearly 60%) were filed by the law firms Mann Bracken or Wolpoff & Abramson.

41.     The following diagram (which was set forth in the Minnesota Attorney General's complaint) shows the relationships between the hedge fund, arbitration, and debt collection enterprises:



42.    The Forum conceals its affiliation with the collections industry through extensive affirmative representations, material omissions, and layers of complex and opaque corporate structuring on multiple websites associated with the Forum and in other forms of advertisement, public statements and elsewhere.

43.    As a result of Defendants' conduct, the Plaintiff and members of the Class were damaged, including by being made to pay arbitration awards that were the result of a biased process designed in favor of the creditor Defendants; interest on those awards; arbitration fees; and such other expenses that Plaintiff and members of the Class may have incurred (such as for their own counsel) in connection with the biased arbitration proceedings.

44.    On July 21, 2009, the U.S. House of Representatives' Domestic Policy Subcommittee Majority Staff Oversight and Government Reform Committee issued a report entitled *Arbitration Abuse: an Examination of Claims Files of the National Arbitration Forum,* which included, *inter alia,* the following findings (emphases added):

a.    "*All* of the [NAF] arbitrators ignored evidence that should have resulted in *dismissal* of *most* of the claims."

b.    "The NAF, itself, did not follow its own rules and sent claims to arbitrators despite the fact that those claims *should have been dismissed* for failure of the creditor to serve the notice [of] arbitration 'promptly.'"

c.    "Arbitrators in *most* . . . claims *ignored* the absence of evidence of whether or not the claims were brought within the statute of limitations."

d.    "Decisions in *identical* cases differed depending on the *identity of the arbitrator* to whom the claim was assigned."

e.    "Arbitrators in *most* of the claims *ignored* the lack of specific evidence of who was actually served with the notice of arbitration."

f.    "Where there was specific evidence of how the notice was served, it often showed that the signature on the receipt was illegible,

was a name *different* from the person who was supposed to be served, or was on one occasion an 'X' and on two occasions a 'John Doe.'"

45.    In addition to these (and other) summary findings, the House report also observed that (emphases added):

a.    *seventy percent* of the claims reviewed in the House investigation "should have been *dismissed* by NAF."

b.    arbitrators "decisions are, in most cases, based *solely* upon written statements made by the attorneys representing the creditor."

c.    consumers' responses, by contrast, "appeared to be given *no weight*."

d.    "[t]he *most* documentary evidence that was provided was a 'final bill' that recited the past due amount or the total amount owed, without any itemization of charges or any indication of when those charges were incurred."

e.    while some NAF rules, if enforced, could help to ensure due process, "NAF *does not care* whether or not its rules are enforced."

f.    "the vast majority of all cases are assigned to a small number of arbitrators who routinely rule in favor of the creditors."

g.    "the creditor can remove the arbitrator with a simple letter, without any need to recite a justification."

h.    the result the consumer gets depends *not* on the merits of the claim, but on "the arbitrator to whom the case is assigned," and the

"assignment is not random" but is instead "designed to maximize decisions favorable to creditors."

i.      arbitrators who dismiss claims that are deficient for reasons such as lack of evidence are "the exception" and "their decisions appear to result in their receiving fewer subsequent case assignments."

j.      NAF's procedures amount not to "arbitration," but to "debt collection made simpler, for the benefit of the creditor and to the detriment of consumers."

46.     The House report also identifies numerous examples of areas in which NAF's arbitrations lack "safeguards" that consumers would have in ordinary courts, including that:

a.      an "[a]rbitrator can ignore the law, and is not subject to any review."

b.      a "[c]ase is assigned 1) by a business entity that has a financial incentive to seek additional cases from the creditor, 2) to a sole-proprietor (the arbitrator) who has a financial incentive to seek additional cases from the creditor, and who is subject to removal at the whim of the creditor."

c.      "[d]ue process is only enforced by an arbitrator who has a financial incentive to seek additional cases from the creditor."

     d.    "[e]verything the consumer asks for comes only at an extra cost, including a hearing."

     e.    "[d]ecisions are usually based on hearsay and often double-hearsay."

47.    An investigation by the non-profit group Public Citizen found that between January 1, 2003, and March 31, 2007, arbitrators working for the Forum ruled for businesses in 94% of the California cases examined, and that, 90% of the Forum's California cases were handled by just 28 arbitrators, who awarded businesses $185 million.[1]

48.    It is not only the cost of these awards, however, that consumers are made to pay.  Creditors also seek interest, as well as substantial arbitration costs, which are significantly higher than court filing fees.  These charges are essentially for attorneys' fees, because the Forum performs the collection work on behalf of the creditor.

49.    Former Forum arbitrators and employees have claimed that the Forum is heavily biased in favor of creditors.

50.    Richard Neely, retired Chief Justice of the West Virginia Supreme Court of Appeals, who upon retirement was appointed as an arbitrator by the Forum but stopped receiving cases after he refused to award attorneys' fees to creditors that he did not believed were allowed under West Virginia law, joined the Minnesota AG in announcing a consumer protection

---

[1] *See* Public Citizen's September 27, 2007 Press Release, *available at* http://www.citizen.org/pressroom/release.cfm?ID=2519.

case against the Forum, and is quoted in a press release as saying "I am happy that a government official has stepped in to try and address this problem. This company tilts the playing field toward creditors and makes a mockery of our legal system."

51.     Neely also wrote an article, *Arbitration and the Godless Bloodsuckers,* sharply criticizing the Forum, which was published in the Sept./Oct. 2006 issue of *The West Virginia Lawyer,* and reports that The Forum "sends the arbitrator a judgment form already filled out so all the arbitrator need do is check the appropriate box and sign his or her name. It looks like a collection agency to me!"

52.     A former manager at the Forum, Deanna Richert, claimed in a federal employment bias suit recently filed against the Forum that the Forum's arbitrations fraudulently favored regular business clients, "who were referred to in-house as the 'Famous Parties.'"[2]

53.     As part of her lawsuit, Ms. Richert has claimed that during her employment with the Forum as a Code Department Manager, she witnessed fraudulent and corrupt practices in the administration of arbitration cases that draw into question the neutrality of any arbitrator associated in any way with the Forum. Specifically, Ms. Richert has said that she witnessed the Forum engage in fraudulent and corrupt practices with respect to the so-

---

[2]     *See* Complaint, *Richert v. National Arbitration Forum, LLC and Dispute Management Services, LLC, d/b/a Forthright,* No. 09-cv-00763 (D. Minn. filed April 2, 2009); *see also* WSJ Blog, *Did the National Arbitration Forum Pander To 'Famous Parties'?* (May 19, 2009), *available at* http://blogs.wsj.com/law/2009/05/19/did-the-national-arbitration-forum-pander-to-famous-parties/.

called "Famous Parties," including but not limited to the following:

      a.     Personnel were instructed in management meetings to call arbitrators and tell them to change decisions in which they found against the Famous Parties, prior to the release of those decisions to the parties to the arbitration;

      b.     Personnel were instructed in management meetings to make sure that certain arbitrators who had decided cases against Famous Parties did not get any more cases;

      c.     The Forum would draft claim forms and fictitious affidavits of service for the Famous Parties, including the placement of stored electronic signatures for the Famous Parties on these documents;

      d.     Arbitrators would call the Forum to ask its attorneys how they should rule on particular matters;

      e.     The Forum would issue rulings against consumers on procedural matters without consulting the arbitrators; and

      f.     The Forum would disallow responses by consumers to claims filed against them simply because consumers did not carbon copy the filers of the claims on their correspondence, thereby putting consumer in default on arbitration claims they had attempted to answer.

54.     The State of California, by and through the San Francisco City Attorney sued the National Arbitration Forum and FIA Card Services, N.A. ("FIA") and Columbia Credit Services, Inc. ("Columbia") in April 2008.  The California Complaint states that the Forum "purports to act as a provider of neutral arbitration services that are fairly administered and characterized by integrity and high legal and ethical standards" when in reality "it is in the business of operating an arbitration mill, churning out arbitration awards in favor of debt collectors and against California consumers, often without regard to whether consumers actually owe the money sought by the debt collectors."  The Complaint further alleges that the Forum also "goes even further to advance the interests of its debt collector clients by unlawfully allowing inflated awards in their favor, such as by awarding attorneys' fees not actually incurred and arbitration costs and fees that cannot legally be shifted to consumers under California law."  The Complaint alleges FIA and Columbia participate in and benefit from the Forum's sham arbitrations by forcing consumers to arbitrate with the Forum which they know to be biased in their favor, failing to inform consumers that the arbitration is nothing but a sham in which the creditors are sure to win, failing in many cases to serve consumers with notice of arbitration at their known address, and by seeking to obtain and collect awards against consumers to which they are plainly not entitled under California law, often including tens of thousands of dollars per

arbitration in unlawful and inflated attorneys' fees, as well as stale debts long past the statute of limitations period.[3]

55.    California, unlike most states, requires arbitration statistics to be reported.  The California complaint alleges that from 2003 through March 31, 2007, of the matters that went to hearing, including a paper hearing, less than 0.2% of the 18,075 disputes arbitrated by the Forum were won by consumers.  Further, all of the consumer wins were in cases in which the consumer had brought a claim against a business – a very small percentage of the Forum's cases.  In *each and every* case where a business entity brought a claim against a consumer and the matter was disposed of by hearing, the Forum arbitrator ruled in favor of the business entity – a 100% success rate.

56.    The California complaint notes that the Forum persuades arbitrators to rule in favor of business entities through a system of incentives that favor awards in favor of businesses rather than consumers and otherwise sets-up a system that favors businesses:

a.    Arbitrators are paid by the number of arbitrations they handle rather than a salary, and thus are motivated to decide matters quickly with little review.

b.    Arbitrators that rule in favor of businesses are rewarded with more business.

---

[3] *The People of the State of California, acting by and through San Francisco City Attorney Dennis J. Herrera v. National Arbitration Forum, Inc.; FIA Card Services, N.A.; Columbia Credit Services, Inc., Does 1-50 inclusive,* No. CGC-08-473569 (Superior Court for the State of California – San Francisco County filed Mar. 24, 2008); *see also* http://www.sfgov.org/site/city_attorney_page.asp?id=88630.

c.     The Forum fires or discontinues using arbitrators who do not rule in favor of businesses.

d.     The Forum ignores defective service procedures, including by disregarding or bending its own rules to benefit businesses, but not consumers (e.g., routinely accepts late filings from debt collectors, but not consumers; routinely ignores consumers' requests for hearings and motions, even though allowed under the Rules).

e.     The Forum's rules and procedures are inadequate to allow consumers to vindicate their rights under the California Fair Debt Collection Practices Act and other California consumer protection laws and policies.  For example, Forum arbitrators issue lump sum awards that allow debt collectors to roll in items to which they are not entitled.

f.     Consumers may only obtain an itemization of an award by paying a fee.

g.     Consumers must pay to have a participatory hearing rather than a paper hearing.

h.     Forum staff in California have heard and decided some motions without following the requirements of the California Arbitration Act, including informing them of their connection to the Forum.

57.     Business Week ran an in-depth article detailing the Forum's bias in 2008, recounting much of the same information reported in the

California complaint and by former West Virginia Supreme Court Chief

Justice Neely, but also describing the Forum's activities as follows:

> NAF sells itself to lenders as an effective tool for collecting debts.  The point of these pitches is to persuade the companies to use the firm to resolve clashes over delinquent accounts.  JPMorgan Chase (JPM) and Bank of America (BAC) are among the large institutions that do so.  A September, 2007, NAF PowerPoint presentation aimed at creditors and labeled "confidential" promises "marked increase in recovery rates over existing collection methods."  At times, NAF does this kind of marketing with the aid of law firms representing the very creditors it's trying to sign up as clients.

58.     A brief filed by Public Justice in *Komarova v. National Credit Acceptance, Inc.* shows that:

a.     NAF's financial interests are strongly aligned with those of banks and debt collectors;

b.     NAF markets itself to creditors as a way to save them money in the debt-collection process;

c.     NAF funnels arbitrations to business-friendly arbitrators and blackballs those who rule in favor of consumers;

d.     NAF routinely enters awards against consumers who are victims of identity theft, never agreed to arbitrate their disputes, or were never properly served;

e.     out of tens of thousands of awards entered by NAF arbitrators, all but a handful have been against consumers.

CLASS ALLEGATIONS

59.    Plaintiff brings this action on behalf of herself and all others similarly situated, pursuant to the provisions of Fed. R. Civ. P. 23(a)(1)-(4), 23(b)(1)-(3), 23(b)(1)-(3), and 23(c)(4)-(5), as the Court may determine to be applicable and appropriate, in connection with the proceedings to certify this action and its common questions as a class action.  Plaintiff proposes the following class definition, subject to amendment as appropriate:

> All persons in the United States who were subject to an arbitration clause requiring them to arbitrate disputes before the National Arbitration Forum and who either were subject to such arbitration proceedings or incurred damages disputing the applicability of the arbitration requirement. Excluded from the class are persons who declared bankruptcy that covered alleged debts to any creditor Defendant.

60.    Alternatively, should it be found that any of Plaintiff's state law claims could not be certified on a national basis, Plaintiff seeks statewide subclasses (or groups of statewide subclasses) for these same persons.

61.    While the exact size of the class is unknown to Plaintiff at present, the members of the class are numerous and geographically dispersed throughout the United States and joinder is impracticable.

62.    Plaintiff's claims are typical of those of the members of the class, in that Plaintiff suffered damages as a result of being subjected to arbitration proceedings before the Forum or disputing the applicability of the arbitration requirement.

63.    Plaintiff will fairly and adequately protect and represent the interests of the class.  The interests of Plaintiff coincide with, and are not antagonistic to, those of the class.

64.    In addition, Plaintiff's counsel are experienced and competent in the prosecution of complex class action litigation.

65.    Questions of law and fact common to the members of the class predominate over questions, if any, that may affect only individual members.

66.    Questions of law and fact common to the Class include, but are not limited to:

a.    Whether Defendants' conduct constituted an unreasonable restraint of trade in violation of the federal antitrust laws;

b.    Whether Defendants conspired to exclude competition from the market for private arbitration of consumer credit disputes and purposefully maintain and exercise monopoly power in that market;

c.    Whether Defendants purposefully and unlawfully maintained and wielded monopoly power in the market private arbitration of consumer credit disputes;

d.    Whether Defendants' actions formed an unlawful enterprise through which Defendants carried out a pattern of racketeering activity;

24

e.      Whether Defendants engaged in deceptive and fraudulent practices, and made false and misleading statements, with the intent that Plaintiffs and others rely on them;

f.      Whether the creditor Defendants breached their contracts with Plaintiffs;

g.      Whether the other Defendants tortiously interfered with the contracts between Plaintiff and the creditor Defendants;

h.      Whether Defendants knowingly misrepresented material facts regarding the impartiality and neutrality of the arbitration proceedings that Plaintiff was forced to accept as part of the contracts with the creditor Defendants; and

i.      Whether Plaintiff was damaged by Defendants' conduct.

67.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy.  Among other things, class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

68.     Plaintiff knows of no difficulty to be encountered in litigation of this action that would preclude its maintenance as a class action.

## COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1: UNLAWFUL AGREEMENTS IN UNREASONABLE RESTRAINT OF TRADE

69.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

70.     As set forth above, on information and belief, in violation of § 1 of the Sherman Act, Defendants entered into exclusionary agreements in unreasonable restraint of trade to steer all consumer credit disputes arising under the contracts between Plaintiff and the creditor Defendants through the Forum.  The Forum has admitted that it is "one of a kind," has "no competitor," does not anticipate competitors, and that the "barriers to entry border on being insurmountable."

71.     No legitimate, pro-competitive business justification existed for these agreements, which were an unreasonable restraint of trade and affected trade in interstate commerce.

72.     Plaintiff and members of the Class have been injured in their business or property by Defendants' antitrust violations, including by being forced into biased arbitration proceedings, in which they were required to pay supra-competitive, artificially inflated arbitration fees.

73.    Such injuries, in the form of overcharges, are of the type the antitrust laws were designed to prevent, and flow from that which makes Defendants' conduct unlawful.

## COUNT II
## VIOLATION OF SECTION II OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2: CONSPIRACY TO MONOPOLIZE

74.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

75.    During the Class Period, and in violation of the Sherman Act § 2 as an illegal conspiracy, Defendants conspired to exclude competition from the market for private arbitration of consumer credit disputes, as well as purposefully maintain and exercise monopoly power in that market.

76.    No legitimate, pro-competitive business justification existed for this conduct, which not only substantially inhibited competition from other private arbitration firms, but also supported the Forum Defendants' exercise of monopoly power in the market.

77.    The conspiracy alleged above has allowed the Forum Defendants and their co-conspirators to exclude less expensive and impartial arbitration alternatives from the market, maintain monopoly power in the market, and consequently, maintain supra-competitive arbitration fees.  The anti-competitive overtones of Defendants' actions vastly outweigh any conceivable pro-competitive justification that might exist for its conspiratorial conduct.

78.     The anti-competitive actions of Defendants and their co-conspirators injured Plaintiff and the other Class Members by forcing them to pay arbitration fees that were greater than would have existed in a free marketplace.

79.     The anti-competitive actions of Defendants and their co-conspirators also injured Plaintiff and the other Class Members by preventing them from participating in unbiased arbitration proceedings.

### COUNT III
### VIOLATION OF SECTION II OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2: MONOPOLIZATION

80.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

81.     During the Class Period, and in violation of the Sherman Act § 2, Defendants purposefully and unlawfully maintained and wielded monopoly power in the market private arbitration of consumer credit disputes.

82.     During the Class Period, Defendants used exclusionary, anti-competitive conduct in violation of the Sherman Act § 2 to maintain and wield their monopoly power.

83.     No legitimate business justification exists for the actions taken by Defendants to maintain monopoly power in the market for private arbitration of consumer credit disputes.

84.     Defendants' illegal monopolistic actions served to exclude less expensive and impartial arbitration alternatives from the market, enabling

Defendants to maintain their monopoly power in the market and consequently, to maintain sales at supra-competitive prices. The anti-competitive overtones of Defendants' actions vastly outweigh any conceivable pro-competitive justification that might exist for their conspiratorial conduct.

85.     The anti-competitive actions of Defendants and their co-conspirators injured Plaintiff and the other Class Members by forcing them to pay arbitration fees that were greater than would have existed in a free marketplace.

86.     The anti-competitive actions of Defendants and their co-conspirators also injured Plaintiff and the other Class Members by preventing them from participating in unbiased arbitration proceedings.

### COUNT IV
### CIVIL RICO – 18 U.S.C. § 1962(C)

87.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

88.     As alleged with particularity above, Defendants worked together and in concert to create and carry on an enterprise engaged in racketeering activities.

89.     As alleged with particularity above, Defendants unlawfully, willingly, and knowingly performed acts or omissions and conduct or participated, directly or indirectly, in the conduct of that enterprise's affairs through the means of a pattern of racketeering activities.

29

90.     As alleged with particularity above, as a direct and proximate result of the aforementioned RICO conduct, Plaintiff and other class members were damaged.

91.     As alleged with particularity above, Defendants are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorneys' fees as provided by 18 U.S.C. § 1964.

92.     To the extent permitted by law, Plaintiff and other Class members are entitled to damages, plus court costs, and pre- and post-judgment interest at the legally allowed limit.

### COUNT V
### CIVIL RICO – 18 U.S.C. § 1962(D)

93.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

94.     Defendants unlawfully conspired, in violation of 18 U.S.C. § 1962(d), to commit the acts described above.

95.     As alleged with particularity above, as a direct and proximate result of the aforementioned RICO conduct, Plaintiff and other class members were damaged.

### COUNT VI
### MINNESOTA PREVENTION OF CONSUMER FRAUD ACT – MINN. STAT. § 325F.69

96.     The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

97.     Minn. Stat. § 325F.69, subdivision 1 (2008) provides:

> The act, use, or employment by any person of any
> fraud, false pretense, false promise,
> misrepresentation, misleading statement or
> deceptive practice, with the intent that others rely
> thereon in connection with the sale of any
> merchandise, whether or not any person has in fact
> been misled, deceived, or damaged thereby, is
> enjoinable as provided in section 325F.70.

98.     The term "merchandise" within the meaning of Minn. Stat. §

325F.69 includes services.  *See* Minn. Stat. § 325F.68, subdivision. 2 (2008).

99.     Defendants' conduct described herein constitutes multiple,

separate violations of Minn. Stat. § 325F.69, subdivision. 1.  Defendants have

engaged in deceptive and fraudulent practices, and made false and

misleading statements, with the intent that Plaintiff and others rely on them

in connection with the sale of Defendants' services.  By failing to disclose and

omitting material facts, Defendants have further engaged in deceptive and

fraudulent practices in violation of the Consumer Fraud Act, and have caused

Plaintiff and other members of the Class damages.

### COUNT VII
### MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT –
### MINN. STAT. § 325D.44

100.    The allegations set forth in each of the preceding paragraphs are

incorporated by reference as if fully set forth herein.

101.    Minn. Stat. § 325D.44, subdivision 1 (2008) provides, in part:

> A person engages in a deceptive trade practice
> when, in the course of business, vocation, or
> occupation, the person:
>
> . . .

(5) represents that goods or services have . . . characteristics . . . benefits . . . that they do not have . . .

(7) represents that goods or services are of a particular standard, quality, or grade . . . if they are of another; . . . .

(9) advertises goods or services with intent not to sell them as advertised . . .

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

102.    Defendants' conduct described above constitutes multiple, separate violations of Minn. Stat. § 325D.44, subdivision 1. Defendants have engaged in deceptive practices by representing that services have characteristics and benefits that they do not have; representing that services are of a particular standard, quality, or grade when they are of another; advertising services with intent not to sell them as advertised; and engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.  In failing to disclose and omitting material facts, Defendants have further engaged in deceptive and fraudulent practices in violation of the Uniform Deceptive Trade Practices Act, and have caused Plaintiff and members of the Class damages.

## COUNT VIII
### MINNESOTA FALSE STATEMENTS IN ADVERTISING ACT –
### MINN. STAT. § 325F.67

103.   The allegations set forth in each of the preceding paragraphs are

incorporated by reference as if fully set forth herein.

104.   Minn. Stat. § 325F.67 (2008) provides, in part, that:

> Any person, firm, corporation, or association who,
> with intent to sell or in anywise dispose of
> merchandise, securities, service, or anything
> offered by such person, firm, corporation, or
> association, directly or indirectly, to the public, for
> sale or distribution, or with intent to increase the
> consumption thereof, or to induce the public in any
> manner to enter into any obligation relating
> thereto, or to acquire title thereto, or any interest
> therein, makes, publishes, disseminates, circulates,
> or places before the public, or causes, directly or
> indirectly, to be made, published, disseminated,
> circulated, or placed before the public, in this state,
> in a newspaper or other publication, or in the form
> of a book, notice, handbill, poster, bill, label, price
> tag, circular, pamphlet, program, or letter, or over
> any radio or television station, or in any other way,
> an advertisement of any sort regarding
> merchandise, securities, service, or anything so
> offered to the public for use, consumption,
> purchase, or sale, which advertisement contains
> any material assertion, representation, or
> statement of fact which is untrue, deceptive, or
> misleading, shall, whether or not pecuniary or
> other specific damage to any person occurs as a
> direct result thereof, be guilty of a misdemeanor,
> and any such act is declared to be a public nuisance
> and may be enjoined as such.

105.   Defendants' conduct described above constitutes multiple,

separate violations of Minn. Stat. § 325F.67.  Defendants have made public

statements that are untrue, deceptive, and misleading, with intent to sell or

33

increase the consumption of services.  In failing to disclose and omitting material facts, Defendants have further made deceptive and fraudulent public statements in violation of the False Statements in Advertising Act, and have caused Plaintiff and other members of the Class damages.

## COUNT IX
### UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION VIOLATIONS – UNDER THE LAWS OF ALL 50 STATES

106.   The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

107.   Alternatively, should the unfair trade practices and consumer protection laws of Minnesota not be applicable to Plaintiff and Class members, as pled above, Plaintiff asserts a claim for Class members for damages under the unfair trade practices and consumer protection statutes of his or her respective state.

## COUNT X
### BREACH OF CONTRACT – UNDER MINNESOTA LAW OR, ALTERNATIVELY, THE LAWS OF ALL 50 STATES

108.   The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

109.   Plaintiff had a contract with a creditor Defendant mandating that any dispute arising under that contract would be resolved through arbitration before The Forum.

110.    The creditor Defendants expressly or implicitly represented, and Plaintiff had a right to expect, that the arbitration process before the Forum would be neutral and unbiased.

111.    As set forth in detail above, the Forum's arbitration process was neither neutral nor unbiased, but was instead designed in favor of the creditor Defendants, and therefore constitutes a breach of the agreements between Plaintiff and the creditor Defendants.

112.    Plaintiff suffered damages as a result of these contractual breaches, when they were ordered to pay arbitration awards; interest on those awards; arbitration fees; and such other expenses that Plaintiff may have incurred (such as for their own counsel) in connection with the biased arbitration proceedings.

113.    Because the Forum Defendants have a principal place of business in Minnesota, and because contract law is sufficiently uniform among the fifty states, it is proper to apply Minnesota law to Plaintiff's or Class members' breach of contract claims.

114.    Alternatively, should Minnesota contract law be held inapplicable to the claims of Plaintiff or Class members who are not residents of Minnesota, Plaintiff asserts a claim for Class members under the contract laws of the state in which he or she resides.

## COUNT XI
## TORTIOUS INTERFERENCE WITH CONTRACT – UNDER MINNESOTA LAW OR, ALTERNATIVELY, THE LAWS OF ALL 50 STATES

115.   The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

116.   The Forum Defendants intentionally interfered, without privilege or justification, with the contracts between Plaintiff and the creditor Defendants, and specifically with Plaintiff's entitlement to neutral and unbiased arbitration proceedings under those contracts.

117.   The Forum Defendants' actions have been in willful and reckless disregard of Plaintiff's rights under their contracts with the creditor Defendants.

118.   The Forum Defendants' interference with Plaintiff's contracts with the creditor Defendants has caused Plaintiff to suffer financial damages, in the form of arbitration awards; interest on those awards; arbitration fees; and such other expenses that Plaintiff and Class members may have incurred (such as for their own counsel) in connection with the biased arbitration proceedings.

119.   Because the Forum Defendants have a principal place of business in Minnesota, and because contract law is sufficiently uniform among the fifty states, it is proper to apply Minnesota law to Plaintiff's and Class members' breach of contract claims.

120.    Alternatively, should Minnesota contract law be held inapplicable to the claims of Plaintiff or Class members who are not residents of Minnesota, Plaintiff asserts a claim for Class members under the contract laws of the state in which he or she resides.

## COUNT XII
### FRAUD -- UNDER MINNESOTA LAW OR, ALTERNATIVELY, THE LAWS OF ALL 50 STATES

121.    The allegations set forth in each of the preceding paragraphs are incorporated by reference as if fully set forth herein.

122.    Defendants knowingly misrepresented material facts regarding the impartiality and neutrality of the arbitration proceedings that Plaintiff was forced to accept as part of her contracts with the creditor Defendants.

123.    Defendants made these misrepresentations with the intent that Plaintiff would rely on them.

124.    Plaintiff justifiably relied on these misrepresentations and had no knowledge that Defendants in fact misrepresented the impartiality and neutrality of the arbitration proceedings.

125.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and Class members sustained damages, including but not limited to arbitration awards; interest on those awards; arbitration fees; and such other expenses that Plaintiff and Class members may have incurred (such as for their own counsel) in connection with the biased arbitration proceedings.

126.    Because the Forum Defendants have a principal place of business in Minnesota, and because common law fraud is sufficiently uniform among the fifty states, it is proper to apply Minnesota law to Plaintiff's and Class members' fraud claims.

127.    Alternatively, should Minnesota fraud law be held inapplicable to the claims of Plaintiff or Class members who are not residents of Minnesota, Plaintiff asserts a common law fraud claim for Class members under the laws of the state in which he or she resides.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants and for the following relief:

(a)    That the Court determine that this action may be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure;

(b)    Judgment against Defendants in favor of Plaintiff and members of the Class for all relief permitted by law, including all applicable damages, the costs of this suit, pre- and post-judgment interest at the legally allowed limit, and reasonable attorney fees;

(c)    That the Court grant Plaintiff and the Class members equitable and/or injunctive decrees setting aside and vacating all verdicts and decisions rendered in NAF arbitration proceedings in

favor of any of the Defendants, and requiring the restitution to Plaintiff and the Class members of all sums paid thereunder; and

(d)     That the Court grant Plaintiff and the Class members such other, further, and different relief as the nature of the case may require or as may be determined to be just, equitable, and proper by this Court.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated:  July 24, 2009                    Respectfully Submitted,


                                          s/Daniel E. Gustafson
                                         Daniel E. Gustafson (#202241)
                                         Karla M. Gluek (#238399)
                                         Jason S. Kilene (#24773X)
                                         GUSTAFSON GLUEK PLLC
                                         650 Northstar East
                                         608 Second Avenue South
                                         Minneapolis, Minnesota 55402
                                         Phone:  (612) 333-8844
                                         Fax:  (612) 339-6622
                                         Email:  dgustafson@gustafsongluek.com
                                                 kgluek@gustafsongluek.com
                                                 jkilene@gustafsongluek.com

                                         Dennis Stewart
                                         HULETT HARPER STEWART, LLP
                                         525 B Street
                                         Suite 760
                                         San Diego, California 92101
                                         Phone:  (619) 338-1133
                                         Fax:  (619) 338-1139
                                         Email:  Dstewart@hulettharper.com

39

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301
Phone:  (800) 256-1050
Fax:  (318) 561-2591
Email:  rarsenault@nbalawfirm.com

Jonathan W. Cuneo
Matthew E. Miller
CUNEO GILBERT & LaDUCA LLP
507 C Street NE
Washington, D.C. 20002
Phone:  (202) 789-3960
Fax:  (202) 789-1813
Email:  jonc@cuneolaw.com
          mmiller@cuneolaw.com

Jon Tostrud
CUNEO GILBERT & LaDUCA LLP
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Phone:  (310) 418-8262
Fax:  (310) 556-9622
Email:  tostrud@yahoo.com

Joe Goldberg
FREEDMAN BOYD HOLLANDER GOLDBERG
& IVES, P.A.
200 3rd Street NW, Suite 700
Albuquerque, NM 87102
Phone:  (505) 842-9960
Fax:  (505) 842-0761
Email:  jg@fbdlaw.com

Garrett D. Blanchfield
REINHARDT, WENDORF & BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota 55101
Phone:  (651) 287-2100
Fax:  (651) 287-2103
Email:  G.Blanchfield@rwblawfirm.com