## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

IN RE: NATIONAL ARBITRATION
FORUM LITIGATION

THIS DOCUMENT RELATES TO:
ALL ACTIONS

Civil No.  09-1939 (PAM-JSM)

**CONSOLIDATED AMENDED
CLASS ACTION COMPLAINT**

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

### INTRODUCTION

1.      The National Arbitration Forum ("Forum") is headquartered in Minnesota, and is the largest arbitration company in the United States for consumer credit disputes.  For each dispute handled by the Forum, the Forum controls the arbitration process.

2.      The Forum has held itself out to the public, courts, and consumers as an independent, impartial entity.

3.      In fact, however, the Forum enforces a biased arbitration process that damages consumers.  The Forum has worked behind the scenes with creditors and debt collection law firms, against the interests of ordinary consumers, in violation of federal and state consumer protection laws.

4.      On July 14, 2009, the Minnesota Attorney General sued the Forum in Hennepin County District Court, Minnesota, alleging violations of Minnesota's consumer fraud, false advertising, and deceptive trade practices laws.

15649

5.    In less than a week, the Forum settled with the Minnesota AG, agreeing to stop arbitrating, taking part in processing, or administering any new consumer arbitrations anywhere in the United States, including any arbitration involving consumer debt, such as credit cards, consumer loans, utilities, telecommunications, health care and consumer leases.  (The Forum can still arbitrate internet domain name disputes, personal injury claims, and other cases.)

6.    This immediate capitulation by the Forum speaks volumes, no matter what the Forum says were its reasons for this decision.  The Forum's arbitration business was extremely lucrative, bringing in millions of dollars a year. The Forum would never have agreed to cease that business if it thought it had a reasonable chance of its business practices being found lawful.

### PLAINTIFFS

7.    Rebecca Kuntz, is a resident of Arkadelphia, Arkansas, against whom MBNA America Bank, N.A. ("MBNA," now FIA Card Services, N.A.) pursued arbitration of a consumer debt dispute through the Forum.  The Forum decided the dispute against Ms. Kuntz, and her wages have been garnished in connection with the arbitration award.

8.    Kerry S. Sydnes is a resident of Lakefield, Minnesota, who arbitrated and lost a consumer debt dispute with the Forum.

9.    Kelly Marquis is a resident of San Antonio, Texas against whom J.P. Morgan Chase & Co. ("Chase") pursued arbitration of a consumer debt dispute through the Forum.

10.     Gabriel Aquino is a police officer and resident of Lutz, Florida.  Mr. Aquino currently faces a pending arbitration in the Forum on a claimed debt owing of $6,655.  Mr. Aquino was first notified of the arbitration of his debt before the Forum in 2007, but no arbitration ever took place and he was not contacted regarding the matter again until July 2009.  After the Minnesota Attorney General filed suit to stop the Forum from pursuing consumer debt arbitrations, Mr. Aquino was informed that the assignee of Mr. Aquino's debt reactivated the proceedings in the Forum.  Mr. Aquino now faces the threat of a biased decision in favor of his creditors in an amount expected to exceed $9,000.

11.     Tommi Head is a school teacher and a resident of Amarillo, Texas.  Ms. Head was forced to arbitrate a credit card debt of $4,863, which had become delinquent when she experienced unexpected medical problems.  Despite Ms. Head's repeated attempts to schedule an arbitration in which she could participate, the Forum held the arbitration without her and ruled against her exclusively on documents produced by Chase.  The Forum resolved her arbitration in favor of Chase for $6,277.

12.     John Vassal is a resident and citizen of the State of Illinois, who arbitrated and lost a consumer debt dispute initiated by Asset Acceptance LLC with the Forum.

13.     Robert Burgi is a resident of Mankato, Minnesota against whom Chase pursued arbitration in a consumer debt dispute through the Forum.

14.     Roger A. Shuler is a resident of Shelby County, Alabama.  Mr. Shuler has been a victim of the practices complained of in this action.

15.     Karen Wicker is a certified teacher who is a resident of DeKalb County, Georgia.  Mrs. Wicker was forced to arbitrate a credit card debt with MBNA in the amount of $2,994.03, which became delinquent when she experienced an unexpected change in her financial circumstances.  Over her response and objections, which were both procedural and substantive, the Forum issued an award in favor of the creditor in the total amount claimed, an amount that totaled in excess of $4,000.00.  The arbitration award was subsequently reduced to judgment in the Superior Court of Fulton County, Georgia.[1]

16.     Peter Kennedy is a small business owner and a resident of Northbrook, Illinois.  When the United States economy suffered its recent downturn, Mr. Kennedy's water purification system sales company suffered and became behind on its corporate debt accounts with several creditors, including Chase.  To avoid bankruptcy for his small business, Mr. Kennedy attempted to negotiate his debts.  Of his multiple debtors, Chase was the only one that refused to negotiate.  Instead, Chase filed an arbitration claim in the Forum in late 2008.  On July 14 2009, the Forum ruled in favor of Chase and issued an award against Mr. Kennedy for $30,283.71.

---

[1] Order, *Pathfinder Financial Corp. v. Karen J. Wicker*, Civil Action No. 2009CV134077 (Super. Ct., Fulton Cty, Ga, May 19, 2009).

17.     Nolan Vassar is a resident of McAllen, Texas against whom Chase pursued arbitration of multiple consumer debt disputes through the Forum.

18.     Laura Siddons is a resident of Portland, Oregon against whom MBNA pursued arbitration of a dispute over $3,636.11 in credit card debt through the Forum. After the relevant statute of limitations had expired and without notifying her that arbitration proceedings had been initiated, the Forum decided the dispute against Ms. Siddons, and issued an award of $9,429. Ms. Siddons' employer has been informed that her wages will be garnished in connection with the arbitration award.

### DEFENDANTS

19.     National Arbitration Forum, Inc. ("NAF, Inc.") is a privately held, for-profit Minnesota corporation, with a registered address and principal place of operations at 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426. NAF, Inc. is the holder of the assumed name "National Arbitration Forum" and also does business under the names "National Arbitration Forum" and "Forum."

20.     National Arbitration Forum, LLC ("NAF, LLC") is a privately held, for-profit Delaware limited liability company with a registered address and principal place of operations at 6465 Wayzata Boulevard, St. Louis Park, Minnesota 55426. NAF, LLC also does business under the name "National Arbitration Forum."

21.     Dispute Management Services, LLC, d/b/a Forthright ("Forthright") is a privately held, for-profit Delaware limited liability company with a registered

address and principal place of operations at 6465 Wayzata Boulevard, St. Louis

Park, Minnesota 55426.  Forthright's registered agent is Michael Kelly.

22.     Collectively, Defendants NAF, Inc., NAF, LLC, and Forthright are

referred to herein as the "Forum," the "Forum Defendants" or "NAF."  The Forum

Defendants share common office space and directors, and each profits from the

Forum's arbitration services.

23.     Accretive, LLC, is a private equity firm headquartered in New York,

New York, which formed and funded Defendants Agora and Axiant, LLC.

24.     Agora is a family of private equity funds based in New York, New

York that was created through Defendant Accretive in 2007 to acquire substantial

financial interests in the Forum.

25.     Axiant, LLC is a debt collection agency headquartered in

Huntersville, North Carolina, which was formed and funded by Defendant

Accretive, LLC and which acquired the national debt collection law firm Mann

Bracken, LLP.

26.     Mann Bracken, LLP is a Delaware limited liability partnership, with

principal offices at 702 King Farm Blvd., Rockville, Maryland 20850.  Mann

Bracken, LLP is the successor by merger of Mann Bracken of Georgia, Wolpoff &

Abramson of the District of Columbia, and Eskanos & Adler of California.  Mann

Bracken is a debt collection law firm used by multiple consumer debt holders to

file and prosecute arbitrations in the Forum.

**JURISDICTION AND VENUE**

27.     The Court has jurisdiction over Plaintiffs' claims under the Class

Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2).  With respect to

CAFA, this Court has jurisdiction since:  (i) the amounts in controversy exceed the

jurisdictional amount, (ii) the Class consists of many thousands of individuals, and

(iii) named Plaintiffs are citizens of Arkansas, Minnesota, Texas, Florida, Georgia,

Illinois, Alabama, and Oregon and Defendants are citizens of Minnesota,

Delaware, New York, North Carolina, and Maryland.

28.     The Court also has jurisdiction over this matter and Defendants

under 18 U.S.C. § 1964, and 28 U.S.C. §§ 1331 and 1337.

29.     This Court can also exercise supplemental jurisdiction under

28 U.S.C. § 1367 over the state law claims because they are derived from the same

nucleus of operative facts as the federal law claims such that Plaintiffs would

ordinarily expect to try them in one proceeding.

30.     Venue is proper in this judicial district under 15 U.S.C. § 22, 18

U.S.C. § 1965(a), and 28 U.S.C. § 1391(b) and (c) because Defendants transact

business, committed an illegal and/or tortious act, have an agent, and/or are found

in this district, and/or because a substantial part of the events described below

were carried out in this district.

31.     In connection with the acts alleged in this Complaint, Defendants,

directly or indirectly, repeatedly and continuously used the means and

instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and interstate electronic communications.

## OPERATIVE FACTS

### *Defendants' Business Practices*

32.     In the fine print of consumer debt agreements (such as for credit cards, consumer loans, utilities, telecommunications, health care and consumer leases), Defendants and creditor banks insert pre-dispute arbitration clauses requiring consumers, like Plaintiffs, to forfeit their rights to have disputes resolved in court, and to have them instead resolved through a private system of binding arbitration.

33.     The agreements, which are sent to millions of consumers by U.S. mail or via interstate electronic communications, typically mandate the use of a particular arbitration firm (or firms), and that firm is frequently the Forum.

34.     The Forum is the largest provider of consumer debt arbitrations in the United States, and claims that it has been appointed as the arbitrator in "hundreds of millions of contracts."

35.     When a consumer owes a debt that the creditor determines cannot be collected by other means, the creditor either initiates an arbitration action or sells the debt to a third party, who initiates an arbitration action.  Either way, these companies are usually represented by outside debt collection law firms.

36.     When a dispute goes to arbitration before the Forum, the Forum controls the arbitration process:  it has drafted the Code of Procedure pursuant to

which arbitrations are conducted, schedules hearings, selects the arbitrator (unless the parties otherwise agree), and is responsible for the dismissal of claims or responses.

37.     The Forum represents itself to the public as a neutral and fair arbitrator.  By way of example, the Forum provides on its website that:

a.     It "ensures that parties receive a fair hearing from an impartial arbitrator at a reasonable cost . . . [and] the same fundamental rights they would receive in court."

b.     It "is committed to the integrity of the legal process, and our arbitrations subscribe to all legal and ethical standards."

c.     Its policies "ensure both an impartial review of the facts as well as a decision based on applicable rules and laws."

d.     It is not "affiliated with credit card companies or other businesses that use pre-dispute arbitration agreements."

e.     It "is an independent administrator of alternative dispute resolution services."

f.     "Cases are heard and decided by unbiased legal experts."

g.     "Our dispute resolution processes are designed to provide both parties with an equal opportunity to prevail."

h.     The Forum is "not beholden to any company or individual that utilizes our services."

38.     Despite these (and other similar) representations to the public, however, the Forum is not a neutral and fair arbitrator.  It is in reality closely tied, as part of one or more enterprises, to creditors and debt collection law firms, and as a result, consumers whose cases are arbitrated through the Forum are hugely disadvantaged.

39.     The Forum obtains business by encouraging creditors to place mandatory pre-dispute arbitration clauses in their customer agreements and appoint the Forum as the arbitrator of any disputes that may arise in the future, and by urging creditors to pursue arbitration claims to collect debts, whether directly or through referrals to debt collection law firms that then file arbitration claims against consumers with the Forum.

40.     As part of this enterprise, the Forum then assists these creditors by helping them to draft arbitration clauses, advising them on arbitration legal trends, and even helping them draft claims to be filed against consumers.

41.     Statements by the Forum reveal that the Forum is not an unbiased arbitrator, but is aligned with the creditors that provide it with a steady stream of income:

    a.     "The customer does not know what to expect from Arbitration and is more willing to pay."

    b.     Consumers "ask you to explain what arbitration is then basically hand you the money."

    c.    "You [the creditor] have all the leverage [in arbitration] and the customer really has no choice but to take care of the account."

### *Defendants' Corporate Structure and Affiliations*

42.    The Forum is financially affiliated with a New York hedge fund group, Accretive, LLC, which owns one of the country's major debt collection enterprises.

43.    From 2006 to 2007, Accretive engineered two transactions through which it simultaneously took control of the country's largest debt collectors and became affiliated with the Forum.

44.    In the first of these transactions, Accretive formed, in 2007, several private equity funds under the name "Agora" (meaning "Forum" in Greek), which invested $42 million in the Forum and obtained governance rights in it.  Both Accretive (Agora) and the Forum (Forthright and NAF, LLC) created new companies in an effort to conceal their connection.

45.    In the second transaction, three of the country's largest debt collection law firms (Mann Bracken of Georgia, Wolpoff & Abramson of the District of Columbia, and Eskanos & Adler of California) merged into one large national law firm called Mann Bracken, LLP, which Accretive then acquired through a debt collection agency that it formed and funded (partly using federal money from the U.S. Small Business Administration), Axiant, LLC.

***Axiant and the Mann Bracken Law Firm Work Together to Collect Debt from
Consumers and File Arbitration Claims in the Forum***

46.     In 2006, the Forum processed 214,000 consumer debt collection

arbitration claims, of which 125,000 (nearly 60%) were filed by the law firms

Mann Bracken or Wolpoff & Abramson.  Mann Bracken has been at the forefront

of promoting mandatory binding arbitration as a means of collecting debt from

consumers.  It claims that: "In 2001, we pioneered the use of arbitration in

collection matters…."  It has also stated that: "Mann Bracken is a recognized

leader in national arbitration collections.  The use of this alternative dispute

resolution can be an effective and efficient means for a creditor or debt buyer to

resolve matters whereby before the only alternative was legal."

47.     Mann Bracken and Axiant work in tandem to fulfill a common

purpose and joint mission of generating revenue for all of the Defendants,

including the Forum Defendants.  Axiant's website states that it offers

"[c]apabilities ranging from call center collections to national arbitration…through

our strategic relationship with Mann Bracken, LLP…."  It further states that its

"[s]trategic relationship with market-leading law firm, Mann Bracken LLP,

enables Axiant to facilitate collections and recovery services to top issuers of and

investors in debt products."  It states that its clients are "market leading issuers of

– and investors in – debt products and portfolios" and that "Mann Bracken LLP

and Axiant work in concert to serve our common clients."  Under a section of its

website itemizing its services, Axiant states that, "Axiant, in cooperation with

Mann Bracken, LLP, a nationwide provider of legal collections and creditor's

rights services" provides "[n]ational arbitration services through Mann Bracken,

LLP."

48.     Mann Bracken's website is substantially similar to Axiant's.  On its

website, Mann Bracken states that it has a "strategic relationship" with Axiant to

collect debt from consumers and that Mann Bracken is "exclusively dedicated to

providing services in concert with Axiant, LLC."  Mann Bracken further indicates

on its website that it is "[p]owered by Axiant" and is "able to tap into 'onlyAxiant'

capabilities…."  Further, Mann Bracken states that "Mann Bracken, LLP, in

cooperating with its servicing partner, Axiant LLC, provides a broad range of

financial services, legal collections and recovery management solutions for its

clients," including "[n]ational arbitration filing and management services."

49.     Mann Bracken has agreements with Axiant in which Mann Bracken

receives management and professional services from Axiant and in turn provides

"arbitration services" to Axiant.  Mann Bracken described its agreements with

Axiant in papers filed with state regulators:

> Subsequent to the contribution of assets and liabilities [to Axiant],
> [Mann Bracken] sold a majority and controlling interest in Axiant,
> LLC to outside investors.  As such, to continue operations [Mann
> Bracken] has entered into an administrative services agreement
> whereby [Mann Bracken] receives certain management and
> professional services and leases office space and equipment from
> Axiant, LLC.  Additionally, [Mann Bracken] has entered into a legal
> services retainer agreement with Axiant, LLC, whereby [Mann
> Bracken] provides arbitration and collection litigation services to
> Axiant, LLC.

50.     Axiant and Mann Bracken are connected in numerous other ways. For instance, Mann Bracken and Axiant post joint job openings.  In recent job postings, Axiant/Mann Bracken describe Axiant as "one of the nation's premier debt collection and recovery management organizations" and states that its capabilities range "from call center collections to national arbitration."

51.     Axiant has stated, in filings submitted to state regulators, that Accretive owns 68.7 percent of Axiant.  Axiant has also told regulators that a variety of individuals and entities affiliated with the Mann Bracken law firm – one of the country's largest debt collection law firms and a filer of thousands of claims in the Forum – own the remaining 31.3 percent of the company.  Each of these individuals with an ownership stake in Axiant is a principal, partner, and/or member of Mann Bracken or its predecessors.

52.     Forum principals recognized early on the problems posed by Accretive's investment in the Forum, and its ties to the Mann Bracken debt collection law firm.  On November 20, 2006, Forum executive Michael Kelly emailed, "I cannot overstate our concern over the Mann Bracken relationship. Although I do not have any solutions off the top of my head, we should certainly plan for unwinding any deal in the event shared ownership becomes an acute issue."  It is because of these concerns that Defendant Agora was created to attempt to hide the relationship between the Forum and Mann Bracken, the law firm being used to file arbitrations there.

53.     Notwithstanding concerns by Forum executives, the obvious conflicts of interest, and continuing relationship with Mann Bracken, the Forum referred companies to debt collection law firms, including Mann Bracken.  In a PowerPoint presentation to a retailer's finance company, the Forum provided contact information for so-called "Arbitration Representatives," which included contact information for the debt collection law firms Mann Bracken and Wolpoff Abramson (which later merged into Mann Bracken).

54.     The following diagram (which was set forth in the Minnesota Attorney General's complaint) shows the relationships between the hedge fund, arbitration, and debt collection enterprises:



55.    The Forum conceals its affiliation with the collections industry through extensive affirmative misrepresentations, material omissions, and layers of complex and opaque corporate structuring on multiple websites associated with the Forum and in other forms of advertisement, public statements and elsewhere.

56.    As a result of Defendants' conduct, Plaintiffs and members of the Class were damaged, including by being made to pay arbitration awards that were the result of a biased process designed in favor of creditor banks and debt collectors; interest on those awards; arbitration fees; and such other expenses that Plaintiffs and members of the Class may have incurred (such as for their own counsel) in connection with the arbitration demand and/or the biased arbitration proceedings.

### *Additional Details Concerning the Conduct of and Relationships Between Defendants*

### *Defendants' Concerted Actions*

57.    As noted above and described in further detail as follows, the Forum's corporate structure is designed to obscure the affiliations that render its claims of independence and neutrality false.  For example, through the creation of new companies (*i.e.*, the Forum's creation of Forthright and Accretive's formation of Agora), these Defendants have avoided public disclosure that Accretive is an owner of the Forum.

58.    In addition, although the Forum Defendants purport to conduct separate operations (with, for example, Defendant Forthright holding itself out as

the arbitration processing/marketing company and Defendant NAF, LLC retaining

the arbitrators), the Forum Defendants in fact operate as part of one enterprise.

Defendant NAF, Inc. owns 100 percent of NAF, LLC and 58.3 percent of

Forthright.  All the Forum Defendants directly profit from the arbitrations.  The

three companies share a common venture, common ownership, the same office

space, common executive leadership, and the same registered address.

59.     NAF, LLC and Forthright also share an extensive services

agreement, which they entered into (as required by the Accretive principals) on

June 27, 2007 (and as amended on July 1, 2007).  Under this agreement, Forthright

controls most aspects of the arbitration administration, including the provision of

the following to NAF, LLC:  all necessary bookkeeping and accounting services;

personnel, facilities, and equipment for management and administrative functions;

all IT systems necessary to support arbitrations; senior executive management

services; all marketing resources, materials, and services; all necessities for human

resources administration; all legal and tax consulting; and all intellectual property

needs.

60.     NAF, LLC pays Forthright substantial fees for its services, including

a monthly seven-figure fee and a "success fee" based on a formula related to the

amount of revenue that NAF, LLC receives.

61.     The Forum principals recognized the problems that would arise if

Accretive's investment in the Forum, and its ties to the Mann Bracken law firm,

became public, and considered abandoning the transaction should the shared

ownership of the companies cause public unease.  It is because of these concerns that Defendant Agora was created.

62.     Under a January 15, 2007 letter of intent, Agora (which would be created several weeks later) was to buy a 40 percent ownership in yet-to-be-formed defendant Forthright.

63.     Beginning with this letter, Agora began to control important aspects of the Forum's operations, including, for example, by requiring that Defendants NAF, LLC and Forthright enter into the aforementioned services agreement.

64.     As this transaction was being carried out, the principals of Defendants Agora and Accretive became privy to information about all aspects of the Forum's arbitration services.

65.     Under a June 27, 2007 agreement between Defendants Agora, NAF, Inc., and Forthright, Agora acquired 40 percent (400,000 Class A units) of Forthright for $42,000,000.

66.     The same day, the same three Defendants entered into an investors agreement.  Examination of the Agora entities involved in this agreement shows them to be the alter ego of Defendant Accretive.

67.     Defendants Agora and Accretive share common office space and common principals, partners, and/or members, and the Forum often refers to Agora principals, partners, and/or members as affiliates of Accretive.

68.     Also by agreement of June 27, 2007, Agora obtained the right to appoint two of the five members of Forthright's board, which right Agora exercised the same day.

69.     Agora/Accretive principals have been substantially involved in the operations of Forthright, including the selection of chief financial and chief operating officers, as well as other personnel; establishing Forthright's sales strategies; setting Forthright's priorities; increasing the steering of credit disputes into arbitrations; responding to media inquiries about the Forum's arbitration's practices; and assisting with lobbying Congress on arbitration issues.

70.     Agora/Accretive also require Forthright to submit detailed periodic reports about key aspects of its operations.

71.     Accretive requires similar reports from Mann Bracken about Axiant, in which (as noted above) Accretive has a majority interest (with principals of the Mann Bracken law firm owning the remainder).

72.     Accretive's website provides that "Axiant's customers include many of the nation's largest financial institutions and consumer debt purchasers."

73.     In papers filed with state regulators, Mann Bracken described its relationship with Axiant as follows:  "In November 2006, [Mann Bracken] contributed the majority of its assets and liabilities related to its telephone collections services operations, including nonattorney personnel, to Axiant, LLC, formerly known as MB Solutions, LLC, which was a newly formed and wholly owned subsidiary of [Mann Bracken]."

74.     The law firm that represented Mann Bracken in the Axiant transaction described it as "a joint venture debt collection business owned by the Mann Bracken partners and Accretive, LLC, a New York hedge fund[,] . . . [which] required the development of a complex legal structure to comply with the regulatory requirements to which law firms and collection agencies are subject. The transaction was a first in the legal industry in that it allowed the Mann Bracken partners to monetize their ownership interests in the law firm."

75.     Axiant has said, in filings submitted to state regulators, that Accretive owns 68.7 percent of Axiant.

76.     The Accretive group invests in Axiant by owning and investing in a company called MB Acquisition Solution Corporation, the president and secretary of which are Accretive principals.

77.     Indeed, the same Agora/Accretive principals involved with the Forum's arbitration business are simultaneously involved in Axiant's debt collection operations.

78.     Axiant and Mann Bracken work together to promote mandatory binding arbitration as a means of debt collection.  On their websites promoting debt collection through arbitration, for example, each refers to the "strategic relationship" it has with the other.

79.     Under agreements between them, and as described in papers filed with state regulators, Mann Bracken receives management and professional services from, and provides "arbitration services" to, Axiant.

80.     Axiant and Mann Bracken are also connected in other ways, including their joint posting of job openings.

81.     The Forum actively conceals its relationships with Accretive, Agora, Mann Bracken, and Axiant through the corporate structures described above, affirmative misrepresentations, and material omissions.

82.     While representing to the public that it is independent and impartial, the Forum in fact actively markets (through e-mail, presentations and in-person meetings) arbitration services as a collections tool, working to convince creditors to include mandatory predispute arbitration clauses in their customer agreements and then file claims against consumers in the Forum.

83.     The Forum pays commissions to executives who convince clients to file arbitration claims in the Forum and bonuses for getting companies in new industries to file claims in the Forum.

84.     The Forum assists corporations, such as creditor banks, in the drafting of arbitration clauses to be included in their customer agreements and the preparation of arbitration claims, counsels them on legal trends affecting arbitration, and refers them to debt collection law firms, such as Mann Bracken.

### *Other Evidence Corroborates Plaintiffs' Allegations*

### ***The Congressional Report***

85.     The U.S. House of Representatives Domestic Policy Subcommittee staff reached conclusions about the Forum after reviewing over 50,000 pages of documents, including hundreds of actual case files, to determine how the claims

were decided by the Forum's arbitrators. *Arbitration or Arbitrary:  The Misuse of Arbitration to Collect Consumer Debts*, Hearing of the Domestic Policy Subcommittee of the House Oversight and Government Reform Committee, 111th Cong. (July 22, 2009).

86.     On July 21, 2009, the U.S. House of Representatives' Domestic Policy Subcommittee Majority Staff of the Oversight and Government Reform Committee issued a report entitled *Arbitration Abuse:  an Examination of Claims Files of the National Arbitration Forum* (the "Report")*,* which included, *inter alia,* the following findings (emphases added):

a.      "Virtually all NAF 'consumer arbitrations' are in fact debt collection actions brought by creditors or assignees of creditors, not by the consumers themselves, and almost all consumer arbitrations are decided in the creditor's favor."

b.      "*All* of the [NAF] arbitrators ignored evidence that should have resulted in *dismissal* of *most* of the claims."

c.      "The NAF, itself, did not follow its own rules and sent claims to arbitrators despite the fact that those claims *should have been dismissed* for failure of the creditor to serve the notice [of] arbitration 'promptly.'"

d.      "Arbitrators in *most . . .* claims *ignored* the absence of evidence of whether or not the claims were brought within the statute of limitations."

e.      "Decisions in *identical* cases differed depending on the *identity of the arbitrator* to whom the claim was assigned."

f.      "Arbitrators in *most* of the claims *ignored* the lack of specific evidence of who was actually served with the notice of arbitration."

g.      "Where there was specific evidence of how the notice was served, it often showed that the signature on the receipt was illegible, was a name *different* from the person who was supposed to be served, or was on one occasion an 'X' and on two occasions a 'John Doe.'"

87.    In addition to these (and other) summary findings, the House report also observed that (emphases added):

a.      *Seventy percent* of the claims reviewed in the House investigation "should have been *dismissed* by NAF."

b.      Arbitrators "decisions are, in most cases, based *solely* upon written statements made by the attorneys representing the creditor."

c.      Consumers' responses, by contrast, "appeared to be given *no weight.*"

d.      "The *most* documentary evidence that was provided was a 'final bill' that recited the past due amount or the total amount owed, without any itemization of charges or any indication of when those charges were incurred."

e.      While some NAF rules, if enforced, could help to ensure due process, "NAF *does not care* whether or not its rules are enforced."

f.   "[T]he vast majority of all cases are assigned to a small number of arbitrators who routinely rule in favor of the creditors."

g.   "[T]he creditor can remove the arbitrator with a simple form letter, without any need to recite a justification."

h.   The result the consumer gets depends *not* on the merits of the claim, but on "the arbitrator to whom the case is assigned," and the "assignment is not random" but instead "appears to be designed to maximize decisions favorable to the creditors."

i.   Arbitrators who dismiss claims that are deficient for reasons such as lack of evidence are "the exception" and "their decisions appear to result in their receiving fewer subsequent case assignments."

88.   The Report therefore concludes that the Forum's arbitration process is not true arbitration, but rather "debt collection made simpler, for the benefit of the creditor and to the detriment of consumers."

89.   The Report also identifies numerous examples of areas in which NAF's arbitrations lack "safeguards" that consumers would have in ordinary courts, including that:

a.   An "[a]rbitrator can ignore the law, and is not subject to any review."

b.   A "[c]ase is assigned 1) by a business entity that has a financial incentive to seek additional cases from the creditor, 2) to a sole-proprietor (the arbitrator) who has a financial incentive to seek additional

cases from the creditor, and who is subject to removal at the whim of the creditor."

       c.     "Due process is only enforced by an arbitrator who has a financial incentive to seek additional cases from the creditor."

       d.     "Everything the consumer asks for comes only at an extra cost, including a hearing."

       e.     "Decisions are usually based on hearsay and often double-hearsay."

### *The Defendants' Own Publicly Available Data*

90.     In California, providers of arbitration services must publish the results of their consumer arbitrations pursuant to California Code of Civil Procedure Section 1281.96.

91.     Of the 33,948 Forum cases reported in California between January 1, 2003 and March 31, 2007, over ninety percent were handled by only two dozen of the Forum's 1,500 arbitrators.  A single arbitrator decided 1,290 arbitration hearings and ruled in favor of the creditor every time.

92.     Of the 18,075 disputes that went to a hearing, businesses won the arbitration at a rate of more than 99.8%.  Thus, consumers won only 30 – less than 0.2% – of the thousands of disputes arbitrated by the NAF that went to a hearing.

93.     Of the 30 disputes where the consumer prevailed at a hearing, the consumer was awarded an average of $2,487.60.  Of the 18,045 disputes where the business prevailed at a hearing, the business was awarded an average of $11,750.

94.     In each NAF arbitration brought by a business entity against a consumer that was disposed of by hearing, the NAF ruled in favor of the business entity every time – a 100% success rate.

95.     An investigation by the non-profit group Public Citizen likewise confirms that between January 1, 2003, and March 31, 2007, arbitrators working for the Forum ruled for businesses in 94% of the California cases examined, and that 90% of the Forum's California cases were handled by just 28 arbitrators, who awarded businesses $185 million.[2]

96.     It is not only the cost of these awards, however, that consumers are made to pay.  Creditors also seek interest, as well as substantial arbitration costs, which are significantly higher than court filing fees.  These charges are essentially for attorneys' fees, because the Forum performs the collection work on behalf of the creditor.

### The Defendants' Marketing Efforts

97.     The Forum's "confidential" and non-public marketing efforts aimed at creditors likewise concede its pro-creditor bias.  *See, e.g.*, Robert Berner & Brian Grow, *Banks Versus Consumers (Guess Who Wins)*, Business Week, Jun. 5, 2008 (describing how a September 2007 Forum "PowerPoint presentation aimed at creditors and marked 'confidential' promises 'marked increase in recovery rates over existing collection methods'").  The Forum has continued to market itself as a

---

[2]  *See* Public Citizen's September 27, 2007 Press Release, *available at* http://www.citizen.org/pressroom/release.cfm?ID=2519.

collection agency to creditor clients.  An April 2009 PowerPoint presentation lists "Arbitration Benefits" including "marked increase in recovery rates over existing collection efforts."  Defendant Dispute Management Services, LLC d/b/a Forthright, *Legal Lift without the Lawsuit* (Apr. 23, 2009).

### *The Defendants' Own Arbitrators and Employees*

98.    Former Forum arbitrators and employees have claimed that the Forum is heavily biased in favor of creditors.

99.    Richard Neely, retired Chief Justice of the West Virginia Supreme Court of Appeals, who upon retirement was appointed as an arbitrator by the Forum but stopped receiving cases after he refused to award attorneys' fees to creditors that he did not believe were allowed under West Virginia law, joined the Minnesota AG in announcing a consumer protection case against the Forum, and is quoted in a press release as saying "I am happy that a government official has stepped in to try and address this problem.  This company tilts the playing field toward creditors and makes a mockery of our legal system."

100.    Neely also wrote an article, *Arbitration and the Godless Bloodsuckers,* sharply criticizing the Forum, which was published in the Sept./Oct. 2006 issue of *The West Virginia Lawyer.*  Mr. Neely explains that most credit card arbitrations are done on the written record without oral presentation or an appearance by the consumer.  For this process, creditors also seek "substantial costs related to the arbitration *itself,* and those costs are significantly higher than court filing fees," and result in the "consumer paying the credit card company's

legal fees."  The Forum "sends the arbitrator a judgment form already filled out so all the arbitrator need do is check the appropriate box and sign his or her name.  It looks like a collection agency to me!"

101.    Arbitrators' independence has been neither encouraged nor rewarded; instead, it has been undermined and punished.  For example, ex-arbitrator (and former state supreme court chief justice) Neely recounts that, when he did not award litigation-related fees to the bank in one case, the Forum never assigned him another case.

102.    Sworn testimony to Congress confirms these aspects of the Forum's arbitration process.  On July 23, 2008, Elizabeth Bartholet, a professor at Harvard Law School, testified before the Senate Committee on the Judiciary regarding the systematic bias she witnessed in favor of credit card companies during her tenure as an arbitrator with the Forum.  *See Courting Big Business: The Supreme Court's Recent Decisions on Corporate Misconduct and Laws Regulating Corporations Before the S. Comm. on the Judiciary 110th Cong.* (2008) (statement of Elizabeth Bartholet, Professor of Law, Harvard Law School).

103.    Professor Bartholet testified that in late 2001 the Forum solicited her to serve as an arbitrator in consumer credit disputes despite the fact that she had no consumer law experience.  In the period between early 2003 and February 2004, the Forum assigned Professor Bartholet 19 cases; she decided 18 of these cases in favor of the same credit card company.  Then, in March 2004, Professor Bartholet was assigned a case where, for the first time, the consumer (a lawyer) requested a

hearing and made a counterclaim against the credit card company for financial damage he suffered as a result of the credit card company wrongfully charging him penalty fees and interest and damaging his credit score. Professor Bartholet ruled in favor of the consumer and ordered the credit card company to pay the consumer $48,000 in damages.

104.   After issuing this decision in favor of the consumer, Professor Bartholet was prevented from hearing the next eleven cases involving the same credit card company that she had ruled against. In seven of these cases, the credit card company requested that she be removed from the case without cause pursuant to the Forum's rules; in the remaining four cases, the company moved to dismiss the case in a way that allowed it to re-file and be assigned to another arbitrator. In three of the cases Professor Bartholet received copies of letters that the Forum had sent to the parties stating that the reason Professor Bartholet would not hear the case was "due to a scheduling conflict," which was patently false. In each of these cases, Professor Bartholet had been removed from the case at the request of the credit card company. When Professor Bartholet confronted the Forum about this systematic bias in favor of the credit card companies, the Forum staff did not deny that the most likely the reason she had been removed from the cases was that she had ruled against the credit card company.

105.   Professor Bartholet testified that she resigned from the Forum after "conclud[ing] from this experience that the NAF process was systematically biased in favor of credit card companies and against debtors, since the process

gave the companies a peremptory challenge right which they use to systematically remove any arbitrator who ruled against a credit card company in a single case, since the companies were apparently using it this way, since the alleged debtors were not in a position to know what was going on, and since the NAF was fully aware of the practice and was either facilitating it or at minimum tolerating it rather than doing anything to address it."  She went on to testify that although she received roughly only 1% of her annual salary from the Forum, most arbitrators depend solely or very largely on the Forum for their income and therefore "there is a very real risk that the NAF pool of arbitrators is overwhelmingly stacked against the consumer, with arbitrators either being removed as I was because they have decided a case for the consumer, or arbitrators being pressured into always ruling for the repeat player companies out of fear of being removed from cases."

106.    A former manager at the Forum, Deanna Richert, claimed in a federal employment bias suit recently filed against the Forum that the Forum's arbitrations fraudulently favored regular business clients, "who were referred to in-house as the 'Famous Parties.'"[3]

107.    As part of her lawsuit, Ms. Richert has claimed that during her employment with the Forum as a Code Department Manager, she witnessed

---

[3]   *See* Complaint, *Richert v. National Arbitration Forum, LLC & Dispute Management Services, LLC, d/b/a Forthright*, No. 09-cv-00763 (D. Minn. filed April 2, 2009); *see also* WSJ Blog, *Did the National Arbitration Forum Pander To 'Famous Parties'?* (May 19, 2009), *available at* http://blogs.wsj.com/law/2009/05/19/did-the-national-arbitration-forum-pander-to-famous-parties/.

fraudulent and corrupt practices in the administration of arbitration cases that draw into question the neutrality of any arbitrator associated in any way with the Forum. Specifically, Ms. Richert has said that she witnessed the Forum engage in fraudulent and corrupt practices with respect to the so-called "Famous Parties," including but not limited to the following:

a.  personnel were instructed in management meetings to call arbitrators and tell them to change decisions in which they found against the Famous Parties, prior to the release of those decisions to the parties to the arbitration;

b.  personnel were instructed in management meetings to make sure that certain arbitrators who had decided cases against Famous Parties did not get any more cases;

c.  the Forum would draft claim forms and fictitious affidavits of service for the Famous Parties, including the placement of stored electronic signatures for the Famous Parties on these documents;

d.  arbitrators would call the Forum to ask its attorneys how they should rule on particular matters;

e.  the Forum would issue rulings against consumers on procedural matters without consulting the arbitrators; and

f.  the Forum would disallow responses by consumers to claims filed against them simply because consumers did not carbon copy the filers

of the claims on their correspondence, thereby putting consumer in default

on arbitration claims they had attempted to answer.

108.   In sworn testimony, Ms, Richert describes that:

> [¶ 15] [W]hile I was employed by them, I witnessed improper practices in the administration of arbitration cases.  These practices were not isolated incidents, but were the result of intentional favoritism toward businesses that had an established relationship with them.  These businesses became known in-house as "Famous Parties".  These "Famous Parties" were repeat filers for arbitration who did not pay for services as they filed, but used the arbitration services so commonly that they paid on a regular account. These Famous Parties sent tens, perhaps hundreds, of thousands of cases to arbitration with defendants' organizations.  As a result, these Famous Parties received special, more favorable treatment in how their claims were handled, such as being provided courtesy copies of submissions by the opposing party, even though the rules required the parties to copy each other, and the assumption that representatives for Famous Parties would always appear by telephone for an in-person participatory hearing.  In addition, I specifically witnessed personnel from the Operations Legal Counsel being instructed to call arbitrators to get them to change the outcome of cases that had been decided unfavorably to Famous Parties, but which decisions had not yet been sent to any party.  I also witnessed instructions being given to make sure that arbitrators who decided cases against Famous Parties did not get assigned to any more cases.  Notations were placed on the arbitrator's profiles, which were maintained on the defendants' computer systems.  I also witnessed personnel creating the claim forms and arbitration agreements for Famous Parties, putting electronic signatures of Famous Party officers or attorneys on those claim forms, and defendants' personnel creating affidavits of service and placing electronic signatures on them for attorneys for the Famous Parties.

> [¶ 18] I am aware of procedural rulings being issued
> by [the Forum's] personnel that favored Famous
> Parties, where the matter was not forwarded by [the
> Forum] to the arbitrator for decision.  I have seen
> defendants' personnel considering answers to claims
> "deficient" based on minor procedural rules.

Affidavit of Deanna Richert, *Richert v. National Arbitration Forum*, No. 09-00763 (ADM/JJK) (D. Minn. July 1, 2009) (Dkt. No. 28).

### ***Sworn Congressional Testimony***

109.    On July 22, 2009, the Domestic Policy Subcommittee of the House of Representatives Oversight and Government Reform Committee held a hearing regarding the misuse of arbitration to collect consumer debts.  Minnesota Attorney General Lori Swanson, among others, provided sworn testimony during the hearing.  Attorney General Swanson testified, "[T]he bottom line is that the National Arbitration Forum represented to the public, to consumers, to the courts, to the government that it was independent and neutral and operated impartially and like a court system, when in fact it had ties to the very industry that brought claims before it."

110.    Attorney General Swanson went on to describe the Forum's ties to the debt collection industry as follows:

> First where the ties came was what I would call
> backroom hustling: going to the credit card companies
> and the banks and so on and so forth and asking the
> lenders to put into the fine print of these contracts
> mandatory arbitration clauses and paying executives
> commissions when they put clauses into those

contracts, and then having other executives who were paid commissions to convince those very corporations to file claims against the consumer in the interest of the creditors against the interest of the consumer.

In addition, far from the impartiality represented to the consumers, marketing materials given to the credit card companies said things like "the customer doesn't know what to expect from arbitration and they're more willing to pay." Or in arbitration, they basically ask you what it is and then they hand you the money.

In addition to that, we found evidence that the company in some cases drafted claims – the equivalent of summons and complaints in a court of law – on behalf of the creditor to be filed against the consumer; that in some cases creditors were advised what their legal rights were, when consumers weren't. In fact, we heard from some employees who said that when consumers did call, people were instructed to really try to get them off the phone as quickly as possible and even in some cases not to pass on a consumer's answer or information to the arbitrator.

We also heard from arbitrators who felt that they were deselected . . . when they didn't rule for the creditor or give the creditor everything it wanted . . . . And then, in addition to that, we found that the National Arbitration Forum is really part of one big debt collection conglomerate – that you have a New York hedge fund called Accretive that essentially owned a $42 million stake in the National Arbitration Forum outfit. And at the same time it owned a debt collection law firm called Axiant, which in turn owned and acquired the debt collection operations of a law firm called Mann Bracken, which is just about the biggest debt collection law firm in the country, so basically having this hedge fund controlling the two sides of the equation or involved in the two sides of the equation – the debt collection side, and as well the arbitration side.

111.    The lack of due process afforded consumers in Forum arbitrations
and the systematic bias in favor of creditors was also highlighted during the
questioning phase of the hearing when Representative Kucinich pointedly asked
Michael Kelly, who was until recently the chief operating officer of the National
Arbitration Forum, Inc. and is now the chief executive officer of Forthright, to
explain why the Forum failed to follow its own rules that were supposed to protect
consumers:

> REP. KUCINICH: Well, you claim that the NAF has
> rules to protect the consumer, but our investigation
> finds that NAF doesn't follow those rules.  The NAF
> has rule six that says that the notice of arbitration must
> be served promptly.  The word "promptly" is not
> defined in your code of procedure.  But until August
> 1st, 2008, NAF rule 41b3 said that any claim could be
> dismissed if more than 90 days passed between the
> filing of the claim and a proof of service of the notice
> of arbitration.  And that was – now, the subcommittee
> staff looked at the forms that the NAF sends to the
> arbitrator with each batch of claims.  They're called
> desk hearing lists.  And each one contains a list of
> claims that the NAF was assigning in that batch and it
> recites for each claim the date on which a claim was
> filed and the date on which the notice of arbitration
> was served.  These desk hearing lists that we reviewed
> show that of 230, approximately 70 percent of the total
> should have been dismissed by the NAF before they
> were even sent to the arbitrators because the notice
> was served more than 90 days – in some cases a lot
> more than 90 days after filing.  But not one of those
> cases was dismissed.
>
> And here is part of the desk hearing list sent to the
> arbitrator Schneider – we'll put up this exhibit . . . it
> shows that NAF sent arbitrator Schneider claims that
> were served more than a year after they were filed –
> clear violations of rule six.  This – doesn't it show that

you don't really follow your own rules when those
rules favor the consumer?

112.    Mr. Kelly attempted to justify this systematic disregard for the

Forum's own rules by claiming that the rule stated the arbitrator "may" dismiss the

claim, but did not require that the claim be dismissed.  Mr. Kelly made no attempt

to explain why, even if that was the case, not a single one of these claims was

dismissed.

### *Other Judicial Proceedings and Investigations*

113.    The State of California, by and through the San Francisco City

Attorney, sued the National Arbitration Forum, FIA Card Services, N.A. ("FIA"),

and Columbia Credit Services, Inc. ("Columbia") in April 2008.  The California

Complaint states that the Forum "purports to act as a provider of neutral

arbitration services that are fairly administered and characterized by integrity and

high legal and ethical standards" when in reality "it is in the business of operating

an arbitration mill, churning out arbitration awards in favor of debt collectors and

against California consumers, often without regard to whether consumers actually

owe the money sought by the debt collectors."  The Complaint further alleges that

the Forum also "goes even further to advance the interests of its debt collector

clients by unlawfully allowing inflated awards in their favor, such as by awarding

attorneys' fees not actually incurred and arbitration costs and fees that cannot

legally be shifted to consumers under California law."  The Complaint alleges FIA

and Columbia participate in and benefit from the Forum's sham arbitrations by

forcing consumers to arbitrate with the Forum which they know to be biased in their favor, failing to inform consumers that the arbitration is nothing but a sham in which the creditors are sure to win, failing in many cases to serve consumers with notice of arbitration at their known address, and by seeking to obtain and collect awards against consumers to which they are plainly not entitled under California law, often including tens of thousands of dollars per arbitration in unlawful and inflated attorneys' fees, as well as stale debts long past the statute of limitations period.[4]

114.   California, unlike most states, requires arbitration statistics to be reported.  The allegations of the California complaint further confirm that from 2003 through March 31, 2007, of the matters that went to hearing, including a paper hearing, less than 0.2% of the 18,075 disputes arbitrated by the Forum were won by consumers.  Further, all of the consumer wins were in cases in which the consumer had brought a claim against a business – a very small percentage of the Forum's cases.  In *each and every* case where a business entity brought a claim against a consumer and the matter was disposed of by hearing, the Forum arbitrator ruled in favor of the business entity – a 100% success rate.

115.   The California complaint notes that the Forum persuades arbitrators to rule in favor of business entities through a system of incentives that favor

---

[4] *California v. National Arbitration Forum, Inc. et al,* No. CGC-08-473569 (Superior Court for the State of California – San Francisco County filed Mar. 24, 2008); *see also* http://www.sfgov.org/site/city_attorney_page.asp?id=88630.

awards in favor of businesses rather than consumers and otherwise sets up a system that favors businesses:

a.      Arbitrators are paid by the number of arbitrations they handle rather than a salary, and thus are motivated to decide matters quickly with little review.

b.      Arbitrators who rule in favor of businesses are rewarded with more business.

c.      The Forum fires or discontinues using arbitrators who do not rule in favor of businesses.

d.      The Forum ignores defective service procedures, including by disregarding or bending its own rules to benefit businesses, but not consumers (e.g., routinely accepts late filings from debt collectors, but not consumers; routinely ignores consumers' requests for hearings and motions, even though allowed under the Rules).

e.      The Forum's rules and procedures are inadequate to allow consumers to vindicate their rights under the California Fair Debt Collection Practices Act and other California consumer protection laws and policies.  For example, Forum arbitrators issue lump sum awards that allow debt collectors to roll in items to which they are not entitled.

f.      Consumers may only obtain an itemization of an award by paying a fee.

g.      Consumers must pay to have a participatory hearing rather than a paper hearing.

h.      Forum staff in California have heard and decided some motions without following the requirements of the California Arbitration Act, including informing consumers of the staff's connection to the Forum.

116.    Business Week ran an in-depth article detailing the Forum's bias in 2008, recounting much of the same information reported in the California complaint and by former West Virginia Supreme Court Chief Justice Neely, but also describing the Forum's activities as follows:

> NAF sells itself to lenders as an effective tool for collecting debts.  The point of these pitches is to persuade the companies to use the firm to resolve clashes over delinquent accounts.  JPMorgan Chase (JPM) and Bank of America (BAC) are among the large institutions that do so.  A September, 2007, NAF PowerPoint presentation aimed at creditors and labeled "confidential" promises "marked increase in recovery rates over existing collection methods."  At times, NAF does this kind of marketing with the aid of law firms representing the very creditors it's trying to sign up as clients.

117.    A brief filed by Public Justice in *Komarova v. National Credit Acceptance, Inc.,* Case No. A12131 (Cal. Ct. App.) shows that:

a.      NAF's financial interests are strongly aligned with those of banks and debt collectors;

b.      NAF markets itself to creditors as a way to save them money in the debt-collection process;

c.      NAF funnels arbitrations to business-friendly arbitrators and blackballs those who rule in favor of consumers;

d.      NAF routinely enters awards against consumers who are victims of identity theft, never agreed to arbitrate their disputes, or were never properly served;

e.      out of tens of thousands of awards entered by NAF arbitrators, all but a handful have been against consumers.

118.    Despite the overwhelming evidence of bias and unfairness in consumer arbitrations conducted by Defendants, Defendants continue to prosecute ongoing arbitrations and seek enforcement of arbitration awards.

119.    As a result of Defendants' conduct, Plaintiffs and members of the Class were damaged, including by being made to pay arbitration awards that were the result of a biased process designed in favor of creditor banks and debt collectors; interest on those awards; arbitration fees; and such other expenses that Plaintiffs and members of the Class may have incurred (such as for their own counsel) in connection with the arbitration demand and/or the biased arbitration proceedings.

## CLASS ALLEGATIONS

120.    Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to the provisions of Fed. R. Civ. P. 23(a)(1)-(4), 23(b)(1)-(3), and 23(c)(4)-(5), as the Court may determine to be applicable and appropriate, in connection with the proceedings to certify this action and its

common questions as a class action. Plaintiffs propose the following class definition, subject to amendment as appropriate:

> All persons in the United States who were involved in a consumer debt collection dispute in which an arbitration proceeding was initiated with the NAF. Excluded from the class are persons who declared bankruptcy that covered alleged debts.

121.    Alternatively, should it be found that any of Plaintiffs' state law claims could not be certified on a national basis, Plaintiffs seek statewide subclasses (or groups of statewide subclasses) for these same persons.

122.    While the exact size of the class is unknown to Plaintiffs at present, the members of the class are numerous and geographically dispersed throughout the United States and joinder is impracticable.

123.    Plaintiffs' claims are typical of those of the members of the Class, in that Plaintiffs suffered damages as a result of being subjected to an arbitration clause requiring them to arbitrate disputes before the NAF.

124.    Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class.

125.    In addition, Plaintiffs' counsel are experienced and competent in the prosecution of complex class action litigation.

126.    Questions of law and fact common to the members of the class predominate over questions, if any, that may affect only individual members.

127.    Questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendants' actions formed an unlawful enterprise through which Defendants carried out a pattern of racketeering activity;

b.      Whether Defendants engaged in deceptive and fraudulent practices, and made false and misleading statements, with the intent that Plaintiffs and others rely on them;

c.      Whether the Defendants tortiously interfered with the contracts between Plaintiffs and creditor banks;

d.      Whether Defendants knowingly misrepresented or omitted material facts regarding the impartiality and neutrality of the arbitration proceedings that Plaintiffs were forced to accept as part of their contracts with creditor banks;

e.      Whether the Forum's corporate structure constituted a conflict of interest in its role as an impartial arbitration forum;

f.      Whether the Forum's financial connection with the debt collection enterprise constituted a conflict of interest in its role as an impartial arbitration forum;

g.      Whether the Forum's management developed and adopted procedures applicable to its appointed arbitrators that favored credit providers and disfavored consumers;

h.      Whether Plaintiffs were damaged by Defendants' conduct;
and

i.      Whether and what equitable and injunctive relief is
appropriate to provide for the disgorgement of Defendants' wrongful gains
and restitution of Plaintiffs' losses, and to protect Plaintiffs from such
wrongful conduct in the future.

128.   Class action treatment is a superior method for the fair and efficient
adjudication of the controversy.  Among other things, class action treatment will
permit a large number of similarly situated persons to prosecute their common
claims in a single forum simultaneously, efficiently, and without the unnecessary
duplication of evidence, effort, and expense that numerous individual actions
would engender.  The benefits of proceeding through the class mechanism,
including providing injured persons or entities with a method for obtaining redress
for claims that might not be practicable to pursue individually, substantially
outweigh any difficulties that may arise in management of this class action.

129.   The Defendants have acted or refused to act on grounds that apply
generally to the Class, making final injunctive, equitable, or declaratory relief
appropriate.  Class treatment is also appropriate to provide consistent adjudication
of common issues to ensure compatible standards of conduct for Defendants, and
to ensure fair and consistent treatment of the interests of the Class.

130.   Plaintiffs know of no difficulty to be encountered in litigation of this
action that would preclude its maintenance as a class action.

## COUNT I
## Civil RICO – 18 U.S.C. § 1962(C)

131.   Plaintiffs incorporate by reference the allegations contained in all preceding paragraphs as if fully restated herein.

132.   Section 1962(c) of the RICO Act makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

133.   As described herein with particularity, Defendants (by and through their employees) have each participated in the operation and management of one or more enterprises for the purposes of obtaining money and property from Plaintiffs and the Class through a pattern of mail and wire fraud.

134.   For example, Defendants Agora, Accretive, Axiant, and Mann Bracken each, individually, used the legal entities NAF, Inc., NAF, LLC, and Forthright, individually, to obtain money and property from Plaintiffs and the Class through a pattern of mail and wire fraud.  Similarly, Defendants NAF, Inc., NAF LLC, and Forthright, each, individually, used the legal entities Agora, Accretive, Axiant, and Mann Bracken, individually, for the purposes of obtaining money and property from Plaintiffs and the Class through a pattern of mail and wire fraud.

135.    Accretive, Agora, Axiant, Mann Bracken, NAF, Inc., NAF LLC, and Forthright are each, separately, an "individual, partnership, corporation, association or other legal entity" and therefore each constitutes a separate, cognizable enterprise under § 1961(4) of the RICO Act.

136.    In the alternative, Defendants formed several association-in-fact enterprises to carry out their scheme.  For example, Accretive, Agora, Axiant and Mann Bracken, each, participated in the operation and management of an association-in-fact enterprise composed of the Forum Defendants.  Also, and in the alternative, NAF, Inc., NAF LLC, and Forthright, each, participated in the operation and management of an association-in-fact enterprise composed of Agora, Accretive, Axiant, and Mann Bracken.  Each of these example association-in-fact enterprises was structured according to a specific business model, described with particularity herein, and constituted a stable group of willing participants with specific roles who were bound by the legal endeavor of providing alternative dispute resolution and debt collection, but who used the enterprises to commit acts of racketeering.

137.    All of the enterprises involved in the misconduct described herein engage in legitimate business apart from their engagement in the improper arbitration practices complained of herein.

138.    Defendants issued, and caused to be issued, the written misstatements and omissions described with particularity herein through the wires, including on Forum websites via the Internet.

139.    Defendants made fraudulent statements to be sent via U.S. Mail to Plaintiffs and Class members.  For example, on July 14, 2009, NAF, Inc. mailed to Plaintiff Kennedy an Award in favor of Chase in the amount of $30,283.71. Within this Award, the Forum states, "The Arbitrator knows of no conflict of interests that exist."  This statement was false.  NAF, Inc. knew at that time that it was involved in the misconduct described with particularity throughout this Complaint.  This Award was mailed by the Forum, and caused to be mailed by Defendants Accretive, Agora, Axiant, Mann Bracken, NAF LLC and Forthright as part of the scheme described herein.  In addition in or around July 2008, Defendant Mann Bracken mailed to Plaintiff Head a Claim for arbitration in the National Arbitration Forum based on an "account due and owing to Claimant in the amount of $4,836.25 [plus interest of] $32.75."  The Claim represented that "A single, neutral arbitrator will resolve Claims."  This statement was false, as it omitted to inform Ms. Head of the Forum's conflicts of interest and scheme described with particularity in this Complaint.  Pursuant to this Claim, the Forum issued an award against Ms. Head in the amount of $6,277.  The Claim was mailed by Mann Bracken and caused to be mailed by Defendants Accretive, Agora, Axiant, NAF, Inc., NAF LLC and Forthright in furtherance of the scheme described herein.

140.    In addition, Defendants mailed, and caused to be mailed, the written misstatements and omissions described with particularity herein.  As an example only, Defendants mailed and caused to be mailed contracts containing sham

arbitration clauses through the U.S. Mails.  These contracts were materially false and misleading in that they failed to alert consumers, including Plaintiffs, to the fact that the Forum was affiliated with Mann Bracken and other Defendants, and otherwise provided no realistic opportunity to ever prevail in a dispute with Defendants.  Further, all of the arbitration documents employed by Defendants, including those used in Plaintiffs' arbitrations, were sent via the U.S. Mail or, on information and belief, via the wires via the Internet and otherwise.  These materials included arbitration claims, notices, correspondence, affidavits, rulings, and other documents sent under the color of authority but which were a sham by virtue of the misconduct described herein.

141.   Defendants' predicate acts were all related in that all of them were committed to further the overall scheme of wrongfully obtaining money from Plaintiffs and the Class through improper arbitration proceedings.  Defendants' predicate activity described herein was carried out at least from 2007, when the Forum became affiliated with Agora, Axiant, Accretive, and Mann Bracken, and continued unabated until July 2009 when the Forum ceased handling consumer arbitrations in response to a complaint filed by the Minnesota Attorney General. Defendants' racketeering thus constituted a closed-ended pattern in violation of the RICO Act.

142.   Plaintiffs and members of the Class have suffered serious injury to their business and property as a direct result of Defendants' racketeering— including but not limited to adverse arbitration awards against them; interest on

those awards; arbitration fees; and such other expenses that Plaintiffs and Class
members may have incurred (such as for their own counsel, and taking their own
time and effort to learn the Forum's procedural rules and comply with them, only
to find out that the Forum largely ignores its own rules) in connection with the
arbitration demand and/or the biased arbitration proceedings.

## COUNT II
### VIOLATIONS OF THE RICO ACT, 18 U.S.C. § 1962(D)

143.     Plaintiffs incorporate by reference the allegations contained in
preceding paragraphs of this Complaint.

144.     Defendants each conspired, in violation of 18 U.S.C. § 1962(d), to
commit the violations of 18 U.S.C. § 1962(c) described above.

145.     Each of the Defendants described herein committed specific overt
acts in furtherance of their conspiracy, as described with particularity herein.

146.     As alleged with particularity above, as a direct and proximate result
of the violative RICO conduct described herein, Plaintiffs and other class members
were injured in their business and property—including but not limited to adverse
arbitration awards against them; interest on those awards; arbitration fees; and
such other expenses that Plaintiffs and Class members may have incurred (such as
for their own counsel, and taking their own time and effort to learn the Forum's
procedural rules and comply with them, only to find out that the Forum largely
ignores its own rules) in connection with the arbitration demand and/or the biased
arbitration proceedings.

## COUNT III
## VIOLATIONS OF FEDERAL ARBITRATION ACT ("FAA")
## 9 U.S.C. § 10

147.   Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

148.   Under 9 U.S.C. § 12, Plaintiffs, on behalf of themselves and all others similarly situated, hereby provide notice of their request to vacate all awards in favor of creditors or debt collectors in consumer debt collection cases. Plaintiffs' notice is timely, as the limitations period is equitably tolled.  The operational, institutional bias and partiality on the part of NAF was not known to Plaintiffs or Class members, and could not have been discovered through reasonably diligent inquiry, until the Minnesota Attorney General disclosed the nature of NAF's corporate relationships with debt collectors, its marketing materials demonstrating prejudice against debtors, and efforts to maintain revenue streams by setting its operations to favor debt collectors.

149.   Awards against Plaintiffs and Class members issued by NAF were procured by corruption or undue means.  There was evident partiality or corruption in the arbitrators and in the arbitral sponsor influencing the actions of arbitrators.  NAF is guilty of misbehavior by which the rights of Plaintiffs and Class members have been prejudiced, as detailed above.  NAF failed to disclose its partiality toward debt collectors and creditors.  As a result, Plaintiffs and Class members have been harmed.  Plaintiffs and Class members, therefore, respectfully

request that, pursuant to 9 U.S.C. § 10, this Court vacate all NAF awards issued against consumers in debt collection cases.

150.   The FAA is not, however, Plaintiffs' and Class members' exclusive remedy.  Pre-dispute, mandatory arbitration clauses appointing the Forum as an arbitrator were not valid due to the failure to disclose the Forum's close financial ties to debt collectors, marketing efforts showing favoritism toward debt collectors, and the Forum's influence over its arbitrators to favor debt collectors.

151.   A contractual arbitration clause cannot eclipse a party's right to a fair, impartial proceeding.  Any fact that might create the impression of possible bias must be disclosed by any arbitrator or arbitral sponsor so that a party to arbitration may object.  The remedy for failure to make proper disclosure is for the Court to set aside an award.  Because the pre-dispute resolution clause assigned arbitration proceedings to the Forum, the requirement to disclose the Forum's potential bias arose at the time of the contractual agreement.  The Forum had the ability to do this, as it drafted the arbitration clauses for the debt owners.  The failure to disclose potential bias at the time of the contractual agreement voids the arbitration clause because it robbed Plaintiffs and Class members of their opportunity to object.  At the time of the contract, there was no reason for Plaintiffs or Class members to know or even anticipate that the Forum was partial or biased in favor of creditors and debt collectors.

## COUNT IV
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE UNITED STATES CONSTITUTION

152.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

153.    The due process clause of the Fifth Amendment to the U.S. Constitution demands impartiality on the part of those who function in judicial or quasi-judicial capacities, even when the adjudicative function sanctioned by the legislature is performed by a private party.  Arbitrators serving under the auspices of the FAA do so in a quasi-judicial capacity.  Due process therefore requires a neutral and detached arbitrator and arbitral sponsor that influences its arbitrators.

154.    NAF has violated Plaintiffs' and Class members' due process rights by failing to disclose its partiality and bias.  By purposefully setting up its very structure and operations to favor debt collectors and creditors over consumers, NAF acted outside the scope of any legitimate arbitral function.  As a result, Plaintiffs and Class members sustained damages including but not limited to adverse arbitration awards against them; interest on those awards; arbitration fees; and such other expenses that Plaintiffs and Class members may have incurred (such as for their own counsel, and taking their own time and effort to learn the Forum's procedural rules and comply with them, only to find out that the Forum largely ignores its own rules) in connection with the arbitration demand and/or the biased arbitration proceedings.

## COUNT V
## VIOLATIONS OF THE MINNESOTA PREVENTION OF CONSUMER FRAUD ACT, MINN. STAT. § 325F.69

155.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

156.    Minn. Stat. § 325F.69, subdivision 1 (2008) provides:

The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

157.    Material omissions stand as violations of Minnesota's consumer protection statutes.  Plaintiffs and Class members need not affirmatively establish subjective reliance upon an omission.

158.    Defendants provide arbitration and debt collection services to those who extend credit.  Both arbitration services and credit-extension services fall within the meaning of "merchandise" under Minn. Stat. § 325F.68, subd. 2.

159.    Because debt collector Defendants purchased debt from creditors who wrote arbitration clauses into the contracts to which they sought to bind consumers, Defendants inherited all the rights, obligations, and liabilities of the creditors, who intended that consumers rely on the statements about arbitration.

160.    Defendants created the right, or assisted creditors in crafting language creating the right, of creditors to compel binding arbitration of disputes using the Forum in place of pursuing a claim in court.  In so doing, Defendants

necessarily and materially implied that such an alternative dispute resolution

procedure would be impartial.  Impartiality is a fundamental, constitutional

principle as applied to courts, and impartiality is equally applicable to the broad

statutory language that governs arbitration proceedings.  Thus, when Defendants

stated that arbitration could be used in place of court proceedings, it was any

rational reader's natural conclusion that *impartial* arbitration would be used.

161.    However, the intended, natural perception of impartial arbitration

was false.  The Forum's marketing, ownership, and very structure ensured that its

profitability was based on bias in favor of businesses filing against consumers.

The Forum was financially tied to the very collection law firm that repeatedly filed

disputes before it.  The Forum's procedures required consumers to pay extra fees

just to be able to receive a hearing.  The Forum marketed its services to creditors

by heralding the fact that its arbitration process stacked the deck against

consumers:  "The customer does not know what to expect from Arbitration and is

more willing to pay"; consumers "ask you to explain what arbitration is then

basically hand you the money"; "You have all the leverage [in arbitration] and the

customer really has no choice but to take care of the account."

162.    Creditors included arbitration clauses in their standard-form

contracts and presented them to consumers, without variance, by mail, either at the

time the credit card user initiated an account or sometime after use of the services

began.  Creditors or their debt collectors who pursue claims with NAF invariably

produce copies of each consumer's agreement to the arbitrator as proof that the

consumer has "agreed" to arbitrate in the Forum. Thus, Defendants cannot claim that they are without notice or specificity as to the timing or substance of the alleged deception, or as to whom the deception was advanced or who advanced it. The Forum is in possession of the deceptive material and it knows to whom the material was sent and where it originated.

163.   In addition, the Forum's affirmative statements of impartiality existed on its website at all times material to this case. The Forum intended consumers to rely on those statements. Such statements were both material to Plaintiffs' claims and blatantly false.

164.   As a direct, proximate and foreseeable result of Defendants' conduct, Plaintiffs and Class members sustained damages—including but not limited to adverse arbitration awards; interest on those awards; arbitration fees; and such other expenses that Plaintiffs and Class members may have incurred (such as for their own counsel, and taking their own time and effort to learn the Forum's procedural rules and comply with them, only to find out that the Forum largely ignores its own rules) in connection with the arbitration demand and/or the biased arbitration proceedings —and are also entitled to injunctive and equitable relief and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

165.   Causation is established in a consumer fraud action where an omission is deemed material, an objective standard. Defendants' omissions in this case were material because no reasonable consumer would want to arbitrate in a

forum that is partial to his or her opponent.  Causation is also presumed where an affirmative statement is materially and blatantly false on its face.

### COUNT VI
### VIOLATIONS OF THE MINNESOTA UNLAWFUL TRADE PRACTICES ACT, MINN. STAT. § 325D.13

166.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

167.    Minnesota Statutes § 325D.13 provides: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."  Consumer protection laws of other states make similar conduct unlawful.

168.    Defendants misrepresented (*i.e.*, by omission) the true quality of arbitration services, as explained above, constituting unlawful trade practices in violation of Minn. Stat. § 325D.13.

169.    As a direct, proximate and foreseeable result of Defendants' conduct in violation of Minnesota's Unlawful Trade Practices Act, Minn. Stat. § 325D.13, Plaintiffs and Class members sustained damages—including but not limited to adverse arbitration awards; interest on those awards; arbitration fees; and such other expenses that Plaintiffs and Class members may have incurred (such as for their own counsel, and taking their own time and effort to learn the Forum's procedural rules and comply with them, only to find out that the Forum largely ignores its own rules) in connection with the arbitration demand and/or the biased

arbitration proceedings —and are also entitled to injunctive and equitable relief

and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

### COUNT VII
### VIOLATIONS OF THE MINNESOTA UNIFORM
### DECEPTIVE TRADE PRACTICES ACT,
### MINN. STAT. § 325D.44

170.    Plaintiffs incorporate by reference the allegations contained in

preceding paragraphs of this Complaint.

171.    Minnesota Statutes § 325D.44, subd. 1 provides:

A person engages in a deceptive trade practice when, in the course of
business, vocation, or occupation, the person:
* * *
(5) represents that goods or services have . . . characteristics,
ingredients, uses, benefits . . . that they do not have;
* * *
(7) represents that goods or services are of a particular standard,
quality, or grade, . . . if they are of another . . .;
* * *
(9)     advertises goods or services with the intent not to sell them as
advertised;
* * *
(13) engages in any other conduct which similarly creates a
likelihood of confusion or of misunderstanding.

172.    Defendants misrepresented (*i.e.*, by omission) the true quality and

nature of arbitration services, as explained above, in violation of Minn. Stat. §

325D.44, and Plaintiffs are thus entitled to injunctive relief.  In addition, as a

direct, proximate and foreseeable result of Defendants' conduct in violation of

Minn. Stat. § 325D.44, Plaintiffs and Class members sustained damages—

including but not limited to adverse arbitration awards; interest on those awards;

arbitration fees; and such other expenses that Plaintiffs and Class members may

have incurred (such as for their own counsel, and taking their own time and effort to learn the Forum's procedural rules and comply with them, only to find out that the Forum largely ignores its own rules) in connection with the arbitration demand and/or the biased arbitration proceedings —and an award of attorneys' fees pursuant to Minn. Stat. § 8.31, subd. 3a.

173.   Because Defendants willfully engaged in the foregoing trade practices knowing them to be deceptive, Plaintiffs and the proposed Class are entitled to recover their costs and attorneys' fees under Minn. Stat. § 325D.45, subd. 2.

## COUNT VIII
### TORTIOUS INTERFERENCE WITH CONTRACT
### UNDER MINNESOTA LAW OR, ALTERNATIVELY, THE LAWS OF ALL 50 STATES

174.   Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

175.   The Forum Defendants intentionally interfered, without privilege or justification, with the contracts between Plaintiffs and their creditors, and specifically with Plaintiffs' entitlement to neutral and impartial arbitration proceedings under those contracts.

176.   The Forum Defendants' actions have been in willful and reckless disregard of Plaintiffs' rights under their contracts with their creditors.

177.   The Forum Defendants' interference with Plaintiffs' contracts with their creditors has caused Plaintiffs to suffer financial damages, in the form of adverse arbitration awards; interest on those awards; arbitration fees; and such

other expenses that Plaintiffs and Class members may have incurred (such as for their own counsel, and taking their own time and effort to learn the Forum's procedural rules and comply with them, only to find out that the Forum largely ignores its own rules) in connection with the arbitration demand and/or the biased arbitration proceedings.

178.    Because the Forum Defendants have a principal place of business in Minnesota, and because contract law is sufficiently uniform among the fifty states, it is proper to apply Minnesota law to Plaintiffs' and Class members' breach of contract claims.

179.    Alternatively, should Minnesota contract law be held inapplicable to the claims of Plaintiffs or Class members who are not residents of Minnesota, Plaintiffs assert claims for Class members under the contract laws of the states in which they reside.

### COUNT IX
### FRAUD
### UNDER MINNESOTA LAW OR, ALTERNATIVELY, THE LAWS OF ALL 50 STATES

180.    Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

181.    When fraud is accomplished by omission or "half-truth," the "reliance" element of causation is replaced with a plaintiff's burden to demonstrate that there was a "duty to disclose."

182.    One who speaks must say enough to prevent his words from misleading the other party.  The word "arbitration" implicitly means impartial arbitration.  Thus, once Defendants used the word "arbitration" to describe the alternative to court resolution, they had the concomitant duty to reveal that the Forum had structural and procedural biases and strong financial incentives to be partial to creditors.

183.    Additionally, Defendants had special knowledge of material facts to which consumers do have not have access, triggering a duty to disclose these facts to consumers, including Plaintiffs.  These material facts are those demonstrating the biases and partiality described above.

184.    Defendants knowingly omitted material facts regarding the impartiality and neutrality of the arbitration proceedings that Plaintiffs were forced to accept as part of their contracts with creditors.

185.    Causation is demonstrated when an omission supporting a deceptive practice claim is "material," an objective standard.  Defendants' omissions in this case were material because no reasonable consumer would want to arbitrate in a forum that is partial to his or her opponent.

186.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and Class members sustained damages, including but not limited to adverse arbitration awards; interest on those awards; arbitration fees; and such other expenses that Plaintiffs and Class members may have incurred (such as for their own counsel, and taking their own time and effort to learn the Forum's

procedural rules and comply with them, only to find out that the Forum largely ignores its own rules) in connection with the arbitration demand and/or the biased arbitration proceedings.

187.     Because the Forum Defendants have a principal place of business in Minnesota, and because common law fraud is sufficiently uniform among the fifty states, it is proper to apply Minnesota law to Plaintiffs' and Class members' fraud claims.

188.     Alternatively, should Minnesota fraud law be held inapplicable to the claims of Plaintiffs or Class members who are not residents of Minnesota, Plaintiffs assert common law fraud claims for Class members under the laws of the states in which they reside.

## COUNT X
### UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION VIOLATIONS UNDER THE LAWS OF ALL 50 STATES

189.     Plaintiffs incorporate by reference the allegations contained in preceding paragraphs of this Complaint.

190.     Alternatively, should the unfair trade practices and consumer protection laws of Minnesota not be applicable to Plaintiffs and Class members, as pled above, Plaintiffs asserts a claim for Class members for damages under the unfair trade practices and consumer protection statutes of their respective states.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants and for the following relief:

(a)     That the Court determine that this action may be maintained as a class action pursuant to the appropriate provisions and sections of Rule 23(b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure;

(b)     Judgment against Defendants in favor of Plaintiffs and members of the Class for all relief permitted by law, including all applicable actual, multiple, and punitive or exemplary damages, the costs of this suit, pre- and post-judgment interest at the legally allowed limit, and reasonable attorney fees;

(c)     That the Court grant Plaintiffs and the Class members equitable and/or  injunctive relief setting aside and vacating all verdicts and decisions rendered in NAF arbitration proceedings against consumers in debt collection cases, and requiring the disgorgement by Defendants and/or the restitution to Plaintiffs and the Class members of all sums paid thereunder;

(d)     That the Court grant Plaintiffs and the Class members declaratory relief, declaring that the filing of arbitration complaints by creditors or debt collectors in the Forum did not toll the applicable statutes of limitations for debt collection actions against Plaintiffs and the Class members; and

(e)     That the Court grant Plaintiffs and the Class members such other,

further, and different relief as the nature of the case may require or as may be

determined to be just, equitable, and proper by this Court.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  October 13, 2009

BY: s/Daniel E. Gustafson
Daniel E. Gustafson (#202241)
Karla M. Gluek (#238399)
Michelle J. Looby (#0388166)
GUSTAFSON GLUEK PLLC
650 Northstar East
608 Second Avenue South
Minneapolis, Minnesota  55402
Tel: (612) 333-8844
Fax: (612) 339-6622

Elizabeth J. Cabraser
Kelly M. Dermody
Michael W. Sobol
Rachel J. Geman
Daniel M. Hutchinson
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, Suite 3000
San Francisco, California  94111
Tel: (415) 956-1000
Fax: (415) 956-1008

Charles S. Zimmerman (#120054)
J. Gordon Rudd, Jr. (#222082)
David M. Cialkowski (#306526)
Brian C. Gudmundson (#336695)
ZIMMERMAN REED, P.L.L.P.
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Tel: (612) 341-0400
Fax: (612) 341-0844

Dianne M. Nast
Joseph F. Roda
Jennifer S. Snyder
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
Tel:  (717) 892-3000
Fax:  (717) 892-1200

Michael L. Roberts
Emily A. Neal
ROBERTS LAW FIRM, P.A.
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas 72223
Tel:  (501) 821-5575
Fax:  (501) 821-4474

Matthew E. Miller
CUNEO GILBERT & LADUCA LLP
507 C Street NE
Washington, D.C. 20002
Tel: (202) 789-3960
Fax: (202) 789-1813

Joseph Goldberg
Sara K. Berger
FREEDMAN BOYD HOLLANDER
GOLDBERG & IVES, P.A.
20 First Plaza, Suite 700
Albuquerque, NM 87102
Tel: (505) 842-9960
Fax: (505) 842-0761

Richard J. Arsenault
NEBLETT, BEARD & ARSENAULT
2220 Bonaventure Court
P.O. Box 1190
Alexandria, Louisiana 71301
Tel: (800) 256-1050
Fax: (318) 561-2591

Jon Tostrud
CUNEO GILBERT & LADUCA LLP
1801 Century Park East, Suite 2400
Los Angeles, California 90067
Tel: (310) 418-8262
Fax: (310) 556-9622

Garrett D. Blanchfield
REINHARDT, WENDORF &
BLANCHFIELD
E-1250 First National Bank Bldg.
332 Minnesota Street
St. Paul, Minnesota 55101
Tel: (651) 287-2100
Fax: (651) 287-2103

Kenneth A. Wexler
Mark R. Miller
WEXLER WALLACE LLP
55 W. Monroe Street, Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222
Fax: (312) 346-0022

Daniel J. Mogin
Noah D. Sacks
THE MOGIN LAW FIRM, P.C.
110 Juniper Street
San Diego, CA 92101
Tel: (619) 687-6611
Fax: (619) 687-6610

Joseph F. Devereux, Jr.
DEVEREUX MURPHY LLC
190 Carondelet Plaza, Suite 1100
St. Louis, Missouri 63105
Tel: (314) 721-1516
Fax: (314) 721-4434

David Boies III
Timothy D. Battin
STRAUS & BOIES, LLP
4041 University Drive
Fifth Floor
Fairfax, VA 22030
Tel: (703) 764-8700
Fax: (703) 764-8704

W. Joseph Bruckner (#147758)
Robert K. Shelquist (#21310X)
Yvonne M. Flaherty (#267600)
LOCKRIDGE GRINDAL NAUEN
P.L.L.P.
100 Washington Avenue South,
Suite 2200
Minneapolis MN  55401
Tel: 612-339-6900
Fax:  612-339-0981

Robert J. Gralewski
GERGOSIAN & GRAWLEWSKI LLP
655 West Broadway, Suite 1410
San Diego, CA 92101
Tel: (619) 237-9500
Fax: (619) 237-9555

Michael J. Brickman
Kimberly Keevers Palmer
David M. Hendricks
RICHARDSON, PATRICK,
WESTBROOK
& BRICKMAN LLC
1017 Chuck Dawley Blvd.
Mount Pleasant, SC 29464
Tel: (843) 727-6500
Fax: (843) 881-6183

Arnold Levin
Laurence S. Berman
Fred S. Longer
LEVIN, FISHBEIN, SEDRAN &
BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663

Richard J. Serpe
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510
Tel: (757) 233-0009
Fax: (757) 233-0455

Michael D. Hausfeld
Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite 650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201

Allan L. Armstrong
ARMSTRONG LAW CENTER, LLC
P.O. Box 2434
Birmingham, AL 35201
Tel: (205) 821-4644

Ethan Preston
PRESTON LAW OFFICES, LLC
1658 North Milwaukee Avenue,
No. 253
Chicago, IL 60647
Tel: (312) 492-4070

Simon B. Paris
Patrick Howard
SALTZ MONGELUZZI BARRETT &
BENDESKY, P.C.
One Liberty Place, 52nd Floor
1650 Market St.
Philadelphia, PA 19103
Tel: (215) 575-3986
Fax: (215) 496-0999

Roberta D. Liebenberg
Donald L. Perelman
FINE, KAPLAN AND BLACK,
R.P.C.
1835 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 567-6565
Fax: (215) 568-5872

James P. Carey (#180555)
SIEBEN, GROSE, VON HOLTUM &
CAREY, LTD.
800 Marquette Avenue, Suite 900
Minneapolis, MN 55402
Tel:  (612) 333-4500
Fax: (612) 333-5970

Marvin Miller
MILLER LAW LLC
115 LaSalle Street
Suite 2910
Chicago, IL 60603
Tel: (312) 332-3400
Fax: (312) 676-2676

Nicholas J. Drakulich
THE DRAKULICH FIRM
2727 Camino del Rio South,
Suite 322
San Diego, CA 92108
Tel: (858) 755-5887
Fax: (858) 755-6456

Hunter Shkolnik
RHEINGOLD, VALET,
RHEINGOLD, SHKOLNIK &
MCCARTNEY, LLP
113 East 37th Street
New York, NY 10016
Tel: (212) 684-1880
Fax: (212) 689-8156

Kevin Landau
TAUS, CEBULASH &
LANDAU, LLP
1515 Broadway, 11th Floor
New York, NY 10036
Tel: (212) 520-4310

Steven A. Schwartz
Denise Davis Schwartzman
CHIMICLES & TIKELLIS LLP
361 West Lancaster Avenue
Haverford, PA  19041
Tel:  (610) 642-8500
Fax:  (610) 649-3633

Darrell L. Cartwright
CARTWRIGHT LAW
CORPORATION
P.O. Box 383204
Birmingham, AL 35238-3204
Tel: (205) 222-5900

Jeffrey B. Gittleman
BARRACK RODOS & BACINE
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 963-0600
Fax: (215) 963-0838

Leonard V. Fodera
SILVERMAN & FODERA, P.C.
1835 Market Street, Suite 2600
Philadelphia, PA 19103
Tel: (215) 561-2100
Fax: (215) 561-0190

Brian M. Clark
WIGGINS, CHILDS, QUINN &
PANTAZIS, LLC
301 19th St N
Birmingham, AL 35203
Tel: (205) 314-0530